[Civ. No. 8856.   Third Dist.   Jan. 7, 1957.]

H. C. CROFOOT et al., Appellants, v. J. H. TARMAN et al., Respondents.

Spurr & Brunner and E. N. Funk for Appellants.

Raymond A. Leonard for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment denying plaintiffs and appellants any relief in an action brought by them to set aside a trustee's deed to real property and to quiet title to the real property against respondents.

Appellants, hereinafter called Crofoot, were the owners of real property in Butte County, California, consisting of about 1,575 acres of land. They had encumbered the title by executing a deed of trust covering the same to secure the payment of an indebtedness of $10,000. Thereafter, in December of 1951, they executed a second deed of trust securing payment of a promissory note payable to Black Rock Mineral Company, a corporation, hereinafter called Black Rock. They did this in order to enable Black Rock to develop certain mining properties on other lands, by negotiating the secured note. As between Crofoot and Black Rock the note was accommodation paper, and Black Rock had promised Crofoot it would pay and discharge the indebtedness secured by the deed of trust. Black Rock negotiated the note to one Allen, and thereafter failed to make payments due. Allen instructed the trustee to begin proceedings to sell the property. The sale was set for November 10, 1952. In the meantime, and on October 31, 1952, Crofoot had entered into a written contract with respondent J. H. Tarman, hereinafter called Tarman, in which Tarman agreed to buy the real property for a price of $78,750. Tarman went into possession of the property and has remained in possession ever since. During the interim between the execution of the purchase contract

and the date of sale under the deed of trust, Tarman, at the solicitation of Crofoot, purchased the accommodation note from Allen in order to postpone the sale. He then instructed the trustee to postpone the sale to the 15th of December following. The transaction between Crofoot and Tarman covering Tarman's purchase of the note from Allen was the subject of a written agreement, the substance of which was as follows: The agreement recited the necessity of obtaining and paying to Allen forthwith the sum of $33,704.97 in order to prevent the trustee's sale on December 15th. It declared that Allen held additional security for the payment of the sum owing to him consisting of a certain lease of property, a chattel mortgage executed by Black Rock upon personal property and also 150,000 shares of the capital stock of Black Rock. It was then stated that if Tarman should procure the necessary funds and pay them to Allen he would be entitled to receive from Allen all the above security; that Tarman had agreed to arrange a continuance of the trustee's sale for not less than 30 days from November 7, 1952; that Tarman should be subrogated to all the rights of Allen. Tarman did postpone the sale to December 15th. Crofoot applied for, and received, a further postponement to December 22d. On the last mentioned date the trustee sold the subject property at public sale to Tarman for the sum of $10,000 and gave him a trustee's deed. Between December 15th and December 22d, the attorney representing Black Rock, which corporation was endeavoring to obtain funds to pay the accommodation note, attempted to contact Tarman's attorney to ascertain the exact date of sale and on failing to reach him was told by his secretary that the sale had been postponed to the 29th of December, which information was erroneous. Black Rock's attorney acquainted Crofoot with the information the secretary had given. Neither Crofoot nor a representative for Black Rock appeared at the sale, and testimony was introduced that Black Rock and Crofoot relied upon the mistaken information they had received as to the date of sale even though, as to Crofoot, he had himself obtained the last postponement to December 22d. They learned of the sale a day or so after it occurred and protested that they should be allowed to pay off the obligation and restore the title to appellants. They caused a notice to be recorded declaring the sale invalid. Tarman, on December 30th, offered, to Black Rock's attorney, to set aside the sale if the money he had paid Allen was returned to him by January 3, 1953.

This offer was conveyed by letter and brought the immediate telephonic response that it would be impossible to raise the money in the time allowed. However, no further offer was made and neither Black Rock nor Crofoot tendered any payment to Tarman. Black Rock continued its endeavors to raise money, and by January 15th it placed in the trust account of its attorney the sum of $35,000. On January 16th the attorney paid Tarman $22,500 for the release of the chattel mortgage which was then in process of foreclosure and offered to pay the balance of the total sum he had expended in purchasing the accommodation note, but Tarman refused to accept it and since has maintained his position as owner of the real property. Tarman never paid to Crofoot any part of the purchase price of the property in accordance with the contract of purchase. In December of 1953 appellants brought the present action.

Appellants first contend that the trustee's sale should be set aside upon grounds of irregularity. They preface their argument by stating the well-settled rule that, although inadequacy of price standing alone will not afford ground for setting aside a trustee's sale, yet gross inadequacy of price in conjunction with irregularities which have the effect of conducing to the inadequacy of price or which have in some other way contributed to the injury to the trustor will afford such support. (*Bank of America* v. *Century Land & Water Co.*, 19 Cal.App.2d 194, 196 [65 P.2d 109]; *Sargent* v. *Shumaker*, 193 Cal. 122, 129 [223 P. 464].)

They point to the following testimony as to inadequacy of price: There was the contract by which respondent, within 60 days of the sale, had agreed to pay appellants $78,750 for the land. Tarman himself testified at the trial that on the day of sale the property was worth $40,000 to $50,000. H. C. Crofoot testified that on the sale date it was worth $50 an acre. A real estate broker testified to the same value. Another real estate broker, testifying as a witness for Tarman, said the land was worth from $25 to $50 an acre. The trial court found that the reasonable market value was "not in excess of $50,000." At the time of the sale the property was encumbered by tax liens in the amount of less than $1,000, and by the first lien deed of trust upon which there was nearly $10,000 owing. Adding these sums to Tarman's bid of $10,000, we see that Tarman got the full title for about $20,000.

Turning now to the alleged irregularities in the sale and their effect upon the sale, Crofoot argues concerning the fact

and the effect of the misinformation as to the date of sale which emanated from the secretary of Tarman's attorney. It appears that they do not in fact claim there were irregularities in the trustee's conduct of the sale, nor that anything done or left undone by the trustee was in violation of the trustee's authority or contrary to the trustee's duties. Indeed, it appears without conflict that the postponement from December 15th to December 22d was made by Tarman upon the personal application of Crofoot who stood by in Tarman's office when Tarman telephoned the trustee, advising it to postpone the sale to the 22d. There is nothing in the record to the effect that anything done or left undone by the trustee prevented the public from attending at the sale or in anywise discouraged bidding. Therefore, the trustee's sale cannot be set aside by reason of irregularities plus inadequacy of price. Crofoot's contention that the sale should be set aside is in reality based upon matters dehors the sale proceedings, that is, upon a claim of fraud or mistake inhering in the misinformation as to the date of sale.

It is admitted by all parties that shortly before December 22d the attorney for Black Rock did call the office of the attorney for Tarman, who was absent; that Black Rock's attorney then talked to the secretary in his office, inquiring as to the correct date to which the sale had been postponed; that, as the court found, the secretary innocently stated the sale had been postponed until the 29th. There is no evidence whatever that the misinformation was fraudulently given, and as noted the court found otherwise.

Crofoot alleged that the representations as to the date of sale were made to the attorney for Black Rock with the fraudulent intent of misleading Crofoot into a false sense of security, preventing appearance at the sale to bid, and preventing Crofoot from paying and discharging the indebtedness. The trial court found against all of these allegations, and specifically found that Crofoot's failure to pay Tarman was not by reason of any misapprehension as to the date of sale, but was because Crofoot relied upon other persons to pay him. This latter finding is supported by the testimony of appellant H. C. Crofoot, who testified that he considered it was up to Black Rock to take care of the matter and that he had their assurance that they had the money; that he himself had arranged a continuance to the 22d and on receiving information from the attorney for Black Rock that the sale had been set forward to the 29th he did not contact respondent to ascertain the

correctness of that statement, even though it conflicted with the arrangements he had personally made with Tarman. When asked by the trial court to tell the court why he waited for a year to bring this action when he knew shortly after December 22, 1952, that the sale had been made, he replied that Black Rock was taking care of the matter, that he did not negotiate with Tarman at any time after January of 1953 and up to the time of filing this action, because it was not up to him to do that, that he had relied on Black Rock to do that, that he had never, between December 22, 1952, and the time of filing this action, made any tender or payment of money to Tarman, because he did not owe him anything.

The most that can be said concerning the fact and the effect of the misinformation as to the date of sale, conveyed to the attorney for Black Rock and by him to Crofoot, is that the facts would have supported a determination by the trial court that the sale ought to be set aside but that such a holding was not compelled. The secretary of Tarman's attorney stated that she had called Tarman's office and was told that the sale had been postponed to the 29th of December. The trial court was not required to hold that that information came from Tarman or was authorized by him. He testified to the contrary and said that he did not know anything about how that information was obtained, if, in fact, the secretary had called his office about the date of sale. The trial court was fully justified in holding, as it did, that there was neither actual nor constructive fraud involved in the matter and was equally justified in holding that Crofoot's allegation that the practical result was to prohibit them or Black Rock from attending the sale and bidding thereat was not supported by the evidence and was untrue. There was testimony that almost immediately after respondent purchased the accommodation note from Allen he began pressing appellants to restore the money to him, because he had had to find the funds necessary and had had to complete the acquisition of the funds from his own private resources which left his business short of operating capital. There was testimony of many promises, made and broken by Crofoot, that they would be able to restore Tarman's money to him if he would grant one more postponement. There was a like history of promises made and not kept on the part of Black Rock in its endeavors to get the money from parties interested in that corporation. There was evidence that Black Rock did not succeed in gathering the money until about the middle of January following the sale. The trial court was

fully justified in refusing the equitable relief of setting the sale aside.

Crofoot contends that because Tarman was in possession of the real property under an executory contract of sale he could not dispute the title of his vendors, and that he acquired and held the title conveyed to him by the trustee for Crofoot's benefit for all the purposes of the executory contract. Reliance is placed upon such cases as *Garvey* v. *Lashells,* 151 Cal. 526, wherein at page 531 [91 P. 498] it is said:

". . . 'A purchaser of land in possession thereof under a contract of sale, by the terms of which the vendor is to give a warranty deed of the property, conveying a good and perfect title thereto, cannot, upon the vendor's failure and inability to convey a good and perfect title, retain both the land and the purchase money until a perfect title shall be offered him, but he must pay the purchase price according to the contract, and receive such title as the vendor is able to give, if he chooses to retain the possession of the land, or he may rescind . . .'

. . . . . . . . . . . . .

". . . The generally accepted rule is to the effect that if the purchaser in possession perfects the title of the vendor pending the executory contract by buying in an outstanding claim, the perfected title inures to the benefit of the vendor for all the purposes of the agreement, and the utmost that the vendee can ask is to be reimbursed for his outlay in obtaining such title, with interest thereon."

We think this rule, under the facts of this case, has no such application to the case at bar as compelled the trial court to enter a decree based thereon. As has been stated, it appears that Tarman did not voluntarily purchase any outstanding claim of title. On the contrary, by a written agreement and at Crofoot's urgent solicitation he purchased the accommodation note held by Allen and received an assignment thereof, and of the other security held by Allen, under an express agreement with Crofoot that by doing so he would be subrogated to all the rights of Allen thereunder. This meant, of course, that, unless appellants themselves or through Black Rock should pay the note, Tarman was entitled to have the property sold at public auction just as Allen was in the process of doing. That such was the true meaning of the contract is further evidenced by the conduct of Crofoot who continually sought postponements of the trustee's sale initiated

by Allen. Tarman took no action with respect to the trustee's sale of the property except what the parties had agreed he might take. By that agreement he stepped into the shoes of Allen; he had the right to have the trustee make the sale; he agreed thereby to postpone the sale for more than 30 days and this he did; and though not compelled to bid, he was entitled to do so. Implicit in the bargain he made with Crofoot was his right, if he bid the property in at public sale, to keep the title he thus acquired.

The judgment is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied January 29, 1957, and appellants' petition for a hearing by the Supreme Court was denied March 5, 1957.