[Civ. No. 4019. Fourth Dist. Mar. 15, 1950.]

DIVISION OF LABOR LAW ENFORCEMENT DEPARTMENT OF INDUSTRIAL RELATIONS, Respondent, v. SAFEWAY STORES, INCORPORATED (a Corporation), Appellant.

Norman S. Sterry, Calvin H. Conron, Jr., John W. Heard, Jr., Gibson, Dunn & Crutcher and William French Smith for Appellant.

Pauline Nightingale and Edward M. Belasco and Leon H. Berger for Respondent.

MUSSELL, J.—Defendant appeals from a judgment in favor of plaintiff in an action brought on behalf of two employees of defendant to recover wages which it was alleged were due them under the provisions of a contract between defendant and the Butchers' Union Local 193 of the Amalgamated Meat Cutters and Butcher Workmen of North America, hereinafter referred to as the "Union."

For many years prior to June 20, 1946, the defendant, throughout its Los Angeles division, had paid its market managers or head meat cutters a weekly salary which had been fixed by contracts with the union, and had in addition to said weekly salary, paid quarterly to its market managers or head meat cutters a bonus. No contract had provided for or required such bonus and the method of its computation had always been prescribed by the defendant. During the whole of the year 1946 the contract between the union and the defendant called for a minimum weekly pay to market man-

agers of $65 per week for a 48-hour week; prior thereto, the weekly payments having been based on a 54-hour week. In 1947, a new bargaining agreement was executed between defendant and the union in which the minimum weekly pay of market managers was fixed at $85.

In June, 1946, defendant inaugurated a bonus plan whereby head meat cutters would receive quarterly ¾ of 1 per cent of their meat section sales, if a certain sales volume was reached; such bonuses were paid to plaintiff's assignors quarterly when they were properly earned under the terms of the plan. The pertinent provisions of this plan were as follows:

"HEAD MEAT CUTTERS' COMPENSATION PLAN

"The Company's plan for compensating Head Meat Cutters provides for each Head Meat Cutter to receive the following:

"1. A weekly salary, as established by the Distribution Division Manager.

"2. A quarterly bonus based on Meat Section sales, providing he qualified as hereinafter outlined.

"SAFEWAY BASE PAY

"The Distribution Division Manager shall designate the Safeway Base Pay for the Safeway Workweek, which is the number of hours regularly required to be worked as established by the Distribution Division Manager. The amount of the Safeway Base Pay and the number of hours to be worked for such pay shall be announced in the usual manner for each Zone or area.

"Such Safeway Base Pay may or may not be the same as the weekly salary the Head Meat Cutter receives for the same number of hours of work. Any weekly salary the Head Meat Cutter receives for the Safeway Workweek, which is in excess of the Safeway Base Pay shall be considered Prepaid Bonus and deducted from the quarterly bonus when settlement is made.

"For example, a Distribution Division Manager may establish a Safeway Base Pay of $50.00 for a Safeway Workweek of 54 hours of work. In such cases, any amount the Head Meat Cutter receives in excess of $50.00 for 54 hours work, regardless of how such pay is calculated, would be Prepaid Bonus and deducted from the bonus due, if any, when the quarterly settlement is made." . . .

"PREPAID BONUS DEDUCTIONS, IF ANY

"As previously outlined, all payments in excess of the Safeway Base Pay, other than pay for hours worked in excess of the Safeway Workweek, shall be deducted from the quarterly bonus when settlement is made."

"SUBJECT TO CHANGE WITHOUT NOTICE

"The plan outlined above can be abandoned or amended by the Company at any time without notice, and notwithstanding such plan or the payment of compensation thereunder, the Company shall have the right to terminate or change the employment of any employee at any time it decides such change is desirable and in the best interest of the company."

It was stipulated that in February, 1946, the defendant issued a bulletin, which was sent to all its stores, in which it was announced that as of February 11, 1946, the base pay of head meat cutters (market managers) would be $65 per week; that the bulletin has never been revoked or cancelled; that the compensation plan was sent to each of defendant's stores and was not superseded or changed until some time in the year 1948.

The bargaining agreement of 1946 contained the following provision: (sub. par. J)

"In no case will bonuses be compiled into the salary schedule." and in the 1947 agreement, a change was made in this provision so that it read:

"(i) In no case will bonuses be compiled into the salary schedule *so as to defeat the purpose of this contract.*" (Italics ours.)

There was no reference in either of the agreements to the bonus plan and the word "bonuses" was used only in the paragraphs quoted.

In calculating the amounts due as bonuses during 1946, the defendant used the base pay of $65 per week as fixed by its bulletin and paid those who earned bonuses the weekly wage of $65, less required legal deductions. During each week of their employment in 1947, the period for which this action was brought and after the execution of the 1947 union contract, defendant paid to plaintiff's assignors their weekly wage of $85, less required legal deductions, and as in 1946, all payments made in excess of the base pay of $65, as established by the bulletin, were deducted from the quarterly bonus when settlement was made. In the period involved in

1947, the increase of $20 per week in the minimum wages, as established by the union contract, was treated as a payment in excess of the base pay established by defendant in its bulletin and deducted from the quarterly bonus. In addition to the written statement of facts, which was submitted to the trial court, testimony was introduced, over objection, as to oral negotiations between the union and the defendant preceding the contract of 1947 and testimony of the plaintiff's assignors that the sums due them had not been paid.

It was the contention of plaintiff in the court below, and is here, that in calculating the amount of bonus to be paid to those market managers who qualified for it, Safeway violated the provision of paragraph (i) of the contract in deducting from the ¾ of 1 per cent of the assignors' gross sales the difference between Safeway's established base pay of $65 per week and the union contract of $85 per week.

The trial court found in part as follows:

"(5) That during the aforesaid employment periods the defendant paid each of plaintiff's assignors the sum of $85.00 per week, $65.00 of said sum being wages and $20.00 of said sum being advance payment on bonus.

"(6) That at the end of the first three months period in March, 1947 the defendant presented a document to each of plaintiff's assignors, setting forth the bonus wages earned; that the said $20.00 per week payment was reflected on the document as prepaid bonus; that the calculations of the defendant showed that the total bonus wages earned were in excess of $20.00 per week times the number of weeks in the said three months period; that plaintiff's assignor Bese was given an additional bonus wage payment of $41.42 and plaintiff's assignor Blomquist was given an additional bonus wage payment of $31.45; that at the termination of the employment of plaintiff's assignors at the date set forth above, another calculation was made and similar documents were presented to plaintiff's assignors showing the bonus wages earned and the $20.00 weekly bonus payments as having been prepaid; and that plaintiff's assignor Bese was given an additional check of $27.33 and plaintiff's assignor Blomquist was given an additional check in the sum of $30.39, covering the amounts of bonus wages in excess of the $20.00 per week bonus wage advance given them. . . .

"(8) That the said collective bargaining agreement con-

tains a provision designated as (i) of Art. 17, which provides the following:

"'In no case will bonus be compiled under the salary schedule so as to defeat the purpose of this contract.'

"(9) That the said collective bargaining agreement was entered into by and between the above designated union and the defendant for the benefit of defendant's employees, including plaintiff's assignors.

"(10) That the defendant violated the terms of the said collective bargaining agreement in that it calculated bonus and salary in a manner which defeated the purpose of the contract by causing one payment of $20.00 per week each to plaintiff's assignors to cover bonus wages and regular wages at the same time."

Judgment was rendered in favor of plaintiff for $940, which sum was the amount deducted by defendant from the bonus settlements of plaintiff's assignors in excess of the base pay established by defendant in its compensation plan.

The single question presented by this appeal is whether the "quoted findings" were supported by or contrary to the evidence.

Defendant argues that "the so-called findings are not findings at all, but the court's conclusions of law, its interpretation of the contract and plan," and that whether considered as conclusions of law or findings of fact, they are unsupported by and contrary to the record, for the following reasons:

"1. That the appellant's method of computing the bonus did not constitute a compilation of the bonus into the salary schedule or constitute any part of the weekly salary as other than salary. On the contrary it constituted a compilation of the salary schedule into the computation of the bonus.

"2. That even if it should be conceded that there was a compilation of the bonus into the salary schedule, it was not compiled so as to defeat the purpose of the contract, it being obvious that the purpose of the contract was to insure a minimum weekly wage of $85.00 per week to each head meat cutter, regardless of whether he received further or additional compensation then or later.

"3. That the construction of the contract and the bonus plan contended for by the plaintiff and adopted by the court is obviously against the manifest intent of the parties.

"4. Even if the documents were subject to the construction contended for by the plaintiff and adopted by the court,—and they are not,—it must be rejected under the rule that

where instruments are susceptible of two interpretations, one which is unreasonable, unfair and will lead to unjust results, and the other reasonable and fair and leading to just results, the first interpretation must be rejected and the latter accepted.''

 This action is based solely on the provision of paragraph (i) of the 1947 union contract and under the provisions of that paragraph, plaintiff, to prevail, must have established that defendant's method of computing the bonus amounted to a compilation of its bonus payments into its salary schedule and further that such compilation defeated the purpose of the contract.

The word ''compile'' is defined in Webster's New International Dictionary as follows:

''Compile: 1. To collect together (literary materials) into a treatise or volume. 2. To put together in a new form out of materials already existing; esp., to compose out of materials from other books or documents; as, to compile a history of Rome. 3. Obs. a. to write; to compose. b. To put together; to heap up; to construct; build. c. To contain; specif., to contain on account of.''

It is apparent that the bonus payments were not added to, projected into, or included in the salary schedule. There was no deduction made in the amounts due as wages in the salary schedule. Plaintiff's assignors received a minimum wage of $65 per week in 1946 and $85 per week in 1947, and there is no contention that these amounts were not paid as provided in the contract.

It is also apparent that the purpose of the 1947 contract was to require the defendant to pay each of its market managers a minimum of $85 per week, regardless of whether at the end of any quarter he did or did not qualify for a bonus. The defendant's obligation to its market managers, considering the contract alone, was fully satisfied by the payment to them of $85 per week. Under the plain terms of the compensation plan, the defendant was authorized to change it at any time without notice and could have discontinued the payment of any bonus whatever. Furthermore, there was nothing in the union contract requiring the payment of any bonus. It seems clear to us that the purpose of paragraph (i) was to make sure that the minimum weekly wage of $85 was paid without deductions and to prevent the defendant from paying weekly to its market managers less than $85 per week

and contending that the difference was made up by a bonus. Any other interpretation would mean that the defendant, after the execution of the contract, could not reduce or change the bonuses then being paid. In this connection it should be noted that in the testimony concerning the negotiations with reference to paragraph (i) of the contract, it appeared that the paragraph as first submitted read as follows:

"Any bonus, when issued, shall not be altered or reduced after the signing of this contract."

This provision of the contract was not satisfactory to defendant and it refused to execute the contract with such a provision in it. Obviously, there was no agreement limiting the defendant as to its right to change, modify or abandon the bonus plan.

We cannot find substantial evidence in the record to support the trial court's finding (5) to the effect that defendant paid plaintiff's assignors $85 per week, of which $65 was wages and $20 advance payment on bonus. Defendant's promise to pay a bonus in accordance with its plan was a promise to pay additional compensation (*Hunter* v. *Ryan,* 109 Cal.App. 736, 737, 738 [293 P. 825]) and such compensation is to be considered as additional salary. (*Walling* v. *Stone,* (C.C.A. 7) 131 F.2d 461, 464.)

While in the statements sent to plaintiff's assignors the words "prepaid bonus" were used to describe the deduction of $20 per week from the bonus amount, it does not follow that the amounts so deducted were a part of the minimum salary payment required by the contract. The bonus was payable quarterly and was conditioned upon the total gross sales of any market equaling a specified percentage of the total gross sales of all markets in that division. The record shows that in the two quarters of 1946, after the adoption of the plan, a number of market managers received no bonus payments because of failing to qualify therefor, assignor Bese being one who failed during the last quarter. In the first two quarters of 1947, 12 out of 25 managers in the first quarter and nine out of 26 in the second quarter failed to maintain the required volume of sales and were paid no bonus. As to those managers whose volume of gross sales did not reach the required percentage to entitle them to the bonus, the whole of the weekly payments which had been made them was salary and no part of it could be considered as prepaid bonus, for the reason that they earned and were paid no bonus whatever. Furthermore, at the time the weekly wage payments were

made, neither the market manager nor the defendant could have known whether a manager would earn or be paid a bonus. It therefore appears that $20 of the weekly payments was not paid as prepaid bonus, but was designated as such in the calculation of bonus earned under the plan to show the deduction allowed by the plan over the base pay fixed by the terms thereof. The words "prepaid bonus" appear only in the plan and in the statements sent to the market managers and they were not intended to and did not apply to or limit the contract for the payment of wages or salary.

The compensation plan, in plain terms, provided for the designation and establishment of a "Safeway base pay," which might or might not be the same as the weekly salary of a head meat cutter. It was further specifically provided therein (for the purpose of bonus computation only) that all payments in excess of the "Safeway base pay" were to be deducted from the quarterly bonus when settlement was made and that the plan could be abandoned or amended by the company at any time without notice.

The contract of 1947 and the compensation plan must be considered and construed together and effect given to the provisions of both documents. (*Hawes* v. *Lux,* 111 Cal.App. 21, 23, 24 [294 P. 1080]; Civ. Code § 1642; *Flinn & Treacy* v. *Mowry,* 131 Cal. 481, 484, 485 [63 P. 724, 1006]; *Lynch* v. *Bank of America,* 2 Cal.App.2d 214, 222, 223 [37 P.2d 716]; *Citizens Nat. T. & S. Bk.* v. *Arrowhead Springs Bev. Co.,* 126 Cal.App. 550, 554 [14 P.2d 821]; *Cobb* v. *Doggett,* 142 Cal. 142, 144 [75 P. 785]; *Daniels* v. *Daniels,* 3 Cal.App. 294, 297, 298 [85 P. 134].)

Construing the contract and plan together, it clearly appears that the defendant was obligated to pay its market managers a weekly salary of $85; that in addition to the $85 salary, it was required to pay a bonus when earned according to the plan. The bonus payments were to be over and above the $85 per week salary, and the defendant could not alter or amend the plan so that bonus payments would reduce the salary below $85 per week.

The defendant's method of computing the bonus payments under the compensation plan did not defeat the purpose of the contract for the reason that the purpose of the contract was to raise the weekly pay from $65 to $85, irrespective of whether certain additional compensation by way of bonuses was or was not paid. It is apparent that upon paying each market manager $85 per week, the defendant was free to pay

additional compensation or not, and, if it elected to do so, use any formula that it desired in computing it, so long as it did not in paying additional compensation reduce the weekly payments below the stipulated amount of $85.

■ Where a contract is susceptible of two interpretations, one of which is reasonable and fair, and the other is unreasonable and unfair, the latter interpretation must be rejected and the first accepted. (*Cohn* v. *Cohn,* 20 Cal.2d 65, 70 [123 P.2d 833] ; *Stein* v. *Archibald,* 151 Cal. 220, 223 [90 P. 536].) We are impelled to the conclusion that the construction adopted by the court was not reasonable, fair and just in the instant case, for under the rule of construction adopted by it, the right of the defendant to change, modify or alter its compensation plan was definitely curtailed.

■ The evidence introduced as to negotiations prior to the execution of the 1947 contract does not in our opinion aid the plaintiff and, on the contrary, it supports the contentions of the defendant. The contract is clear and unambiguous and, therefore, the testimony of prior oral negotiations is inadmissible. (*Courtwright* v. *Dimmick,* 22 Cal.App.2d 68, 70 [70 P.2d 269] ; *Payne* v. *Commercial Nat. Bank,* 177 Cal. 68, 72 [169 P. 1007, L.R.A. 1918C 328].)

As heretofore noted, prior to the opening of the negotiations the union had submitted a proposed contract in which paragraph (i) read:

"In no case will bonuses be compiled into the salary schedule *neither shall they be reduced after the signing of this contract* so as to defeat the purpose of this contract." (Italics ours.)

Opposite this proposal the industry representatives had written the word "no" and in the ensuing conferences, the industry representatives refused to agree to the clause as proposed and the italicized words were, by agreement of the parties, omitted from paragraph (i).

A witness called by the plaintiff, who was secretary and treasurer of a butchers' local and represented the union, testified:

"A. There had been inserted into the previous contract, the wording which was slightly different at this particular time, which said 'Any bonus, when issued, shall not be altered or reduced after the signing of this contract.' There were objections on their part to that which at that particular time I said we would carry it on, and there would be further discussion. That ended up at that time, and we arrived at a deadlock.

"Q. What was the dispute over—give us an example? A. The conclusion was at the next meeting a certain portion be stricken out 'to be altered or changed', that is to change the plan of the bonus, the objections which we had to it was the fact we didn't wish them to pay the individuals a certain basic wage, and then count the difference between the basic wage and that wage, which would cut down contractual negotiations. He didn't feel it would be right to pay the individual $65 a week on a basis which was not part of the contract, and which appeared had no bearing whatsoever, and was strictly a merit program offered by Safeway to their employes, that they would take that merit program and include that into the salary schedule, and claim that was part of the salary that was arrived at in the negotiations. We wanted the $85, so the wages would be $85 salary, not $65 salary and $20 bonus, but $85 salary, and this clause was arrived at and inserted according to the negotiations.

"Q. And this clause was put in subsequent to the Safeway plan being in operation? A. That is right."

The uncontradicted testimony of the authorized representative of the industry was in part:

". . . that we felt the bonus was a managerial prerogative, and I would not agree that they take that. In the negotiations we were strictly dealing with Union wages and so on account of the clause being in the 1946 contract, there was no objection made if the center part of the clause was stricken out 'To defeat the purpose of the contract', because we were dealing with the minimum rate of pay, and as long as they got $80 or $85 there was no bearing on beating the purpose of the contract.

"Q. When you say $80 and $85, you are referring to $80 for the journeymen and $85 for the head meat cutters? A. Yes.

"Q. Was that what you told the Union representatives? A. That has always been our position.

"Q. Is that what you told them, in substance? A. That is right."

From the foregoing testimony it is quite evident that the Safeway representative understood that if the company paid the increased amount of $85 each week to its market managers, it could continue to compute its bonuses in accordance with its published and promulgated plan.

We think that the oral testimony was inadmissible to vary the terms of the contract. (*Dollar* v. *International Banking Corp.*, 13 Cal.App. 331, 336, 343 [109 P. 499].)

It is contended by the plaintiff that it is the province of the trial court to determine disputed issues of fact and that the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence to support the trial court's findings (*Overton* v. *Vita-Food Corp.*, 94 Cal.App.2d 367, 370 [210 P.2d 757]), and that this court is bound by the trial court's construction of the contract where parol evidence is introduced in aid of interpretation of the contract, and where the evidence is such that conflicting inferences may be drawn therefrom. However, a finding of fact unsupported by or contrary to the evidence is not binding upon an appellate court. Where there is no conflict in the evidence, the finding of the trial court amounts to a conclusion of law. (*San Diego T. & S. Bank* v. *County of San Diego*, 16 Cal.2d 142, 153 [105 P.2d 94, 133 A.L.R. 416].) As said in *Leis* v. *City and County of San Francisco*, 213 Cal. 256, 258 [2 P.2d 26] :

"The evidence thus educed before the trial court being, as to the essential factors thereof, undisputed and indisputable, the findings and conclusions of the trial court thereon amounted to merely conclusions of law, and as such the proper subject of review upon this appeal."

There is nothing in the record showing that the $20 a week was paid as bonus, as stated in the court's fifth finding. The record is to the contrary, it being stipulated that each week $85 was paid to plaintiff's assignors and each and every other head meat cutter. The statement of the trial court that $20 of each week's payment was an advanced bonus payment was the court's conclusion as to what was the legal effect of the stipulated acts of the parties.

It seems clear to us that the trial court's finding (10), wherein it is stated that the defendant violated the terms of the contract by its method of payment, was also a conclusion. Particularly is this true, where, as here, there was no declaration by the trial court, either as a purported finding or as a conclusion, of the purpose of the contract.

We conclude that the findings are not supported by substantial evidence. Judgment reversed.

Barnard, P. J., and Griffin, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 11, 1950. Carter, J., voted for a hearing.