[Civ. No. 5930.   Fourth Dist.   Dec. 17, 1959.]

MOLYBDENUM CORPORATION OF AMERICA (a Corporation), Plaintiff and Appellant, v. J. BRYANT KASEY et al., Defendants and Appellants.

Schultheis & Laybourne, Everett B. Laybourne, Lonergan & Jordan and John B. Lonergan for Plaintiff and Appellant.

Scudder & Forde and Guy Richards Crump for Defendants and Appellants.

SHEPARD, J.—This is an action for declaratory relief wherein both parties seek clarification of a dispute over their rights in certain unpatented mining claims in the Clark Mountain Mining District of San Bernardino County. Both parties have appealed.

From the record before us it appears that during the years 1924 to 1950, 13 unpatented lode mining claims were located by plaintiff's (hereinafter called Company) predecessors in interest in the area with which we are concerned. Twelve of these claims (hereinafter referred to as Sulphide Queen claims) bear the names Sulphide Queen Numbers 1 and 2; Lead Mountain Numbers 2, 3 and 4, and East Extension; Wash Queen; Wash Queen Number 2; Hard Rock Queen; and Sulphide King Numbers 1, 2 and 3. These 12 claims were all acquired by Company before entering into the contract with defendants (hereinafter called Kasey) on June 11, 1951, which contract hereinafter will be discussed at length. Also in the year 1950, Kasey located 29 lode and placer mining claims in the same area. Such lode claims are called Sleeper Numbers 1 and 4; Dymius; Dymius Number 1; Somnabulist Number 3; Somnabulist Fraction Numbers 1 and 2; Sleeper Fraction Number 1; Morpheus Numbers 1, 2, 3, 4 and 5; Galenite; Barito; Neola; La Prase; Neodymius and Neodymius Number 1. The placer claims are called Lanthan Numbers 1, 2, 3, 4, 5 and 6; Alluvium, Alluvium Number 1 and Aqua.

On June 11, 1951, Company entered into the contract with Kasey for the purchase of Kasey's claims. July 22, 1951, Company through its agent Allen located a lode claim called Betty Ann and title was later transferred to Company. September 21, 1951, Company exercised its option to purchase under the contracts, and deeds were thereupon executed and delivered by Kasey to Company. On or about March 2, 1950, and prior to any of Kasey's locations one Krone located a lode claim called Onessa Number 4, title to which was acquired by Company by purchase on December 20, 1951. Kasey attempted to locate Sleeper Number 1 Annex on April 9, 1955. By its complaint Company only contests the validity of Kasey claims Lanthan Number 1, Sleeper Number 1, Sleeper Number 4, Dymius, Dymius Number 1, Somnabulist Number 3 and Somnabulist Fraction Number 1.* The real burden of the controversy is that Company seeks an adjudication that will relieve

*See sketch on following page.

it of the obligation to pay royalty on minerals mined by it from the claims in question, and Kasey seeks a contrary adjudication.

An understanding of the contract is vitally essential to a determination of the issues of the case. The contract first recites representation of ownership of claims by the parties and the desire of Company to acquire all of the Kasey claims and appurtenant rights lying within a 10-mile radius of a point which is fairly central to all of the claims named in the contract. Section First grants a 90-day option to Company to purchase the Kasey claims for a total purchase price of

$2,000,000, $15,000 of which was paid down for the option, $135,000 of which was paid on the exercise of the option and the execution and delivery of the deeds from Kasey to Company, and the total balance from royalties from the expected recovery of minerals from the claims. Section Second warrants Kasey's good title in the claims agreed to be sold (called in the contract Primary Claims). Section Third grants Company the right to "enter into possession" of the Kasey claims and to mine for testing purposes during the 90-day option period. Section Fourth provides that whenever Company commences commercial production from any of the other Sulphide Queen claims it will also commence and continue, within economically feasible limits, the production from Wash Queen claim. Section Fifth provides that Company will pay royalties on production from any valid Kasey claims except that no royalty will be paid from production on the Sulphide Queen claims. Then follows an exception to the exception which says "Excepting only . . . minerals mined from any deposit or vein within both the Wash Queen claim and a good, valid and subsisting Primary Claim and not within any of the other Sulphide Queen claims." Then follows a royalty limitation (as to Wash Queen) of 135,000 tons and a recital that references are to claims as presently located on the ground, methods of computing net returns for royalty purposes, and the total maximum royalty limitation. Section Sixth covers procedure in payment of royalties and in giving notices by one party to the other. Section Seventh provides that on the exercise of the option Kasey "will thereby (a) admit that each of the lode mining claims included in the Sulphide Queen claims as now monumented and marked on the ground is and has been a good, valid and subsisting mining claim"; that Kasey consents to a judgment quieting Company's title to the Sulphide Queen claims as against Kasey in a then pending action, "provided that the foregoing shall not prejudice any rights which the OWNERS would otherwise have to receive royalties under Section Fifth hereof." Section Eighth requires Kasey to perform and file proofs of annual assessment work. Section Ninth must be quoted in full:

"NINTH: It is understood that MOLYBDENUM has not made or completed an examination respecting the validity of the Primary claims or respecting the existence or value of any rare earth minerals therein and it is agreed that neither the execution of this Agreement nor the exercise of the option herein provided by MOLYBDENUM shall prejudice or impair the

right of MOLYBDENUM to assert in good faith the invalidity of any of the Primary or Secondary claims or the exercise by MOLYBDENUM of the full and complete rights of ownership of the Primary and Secondary claims, including, without limitation, the right to determine whether it shall mine (excepting only as otherwise specifically provided in Section FOURTH hereof), maintain or abandon any of said claims or any part thereof, provided, however, that if MOLYBDENUM shall abandon any Primary claim or part thereof and relocate the same, such abandonment and relocation shall not relieve MOLYBDENUM from any obligation it might otherwise have to pay royalty under the provisions of Section FIFTH of this Agreement.''

Section Tenth provides methods to settle net proceeds disputes. Section Eleventh prevents the agreement from being used as evidence if the option be not exercised. Section Twelfth requires each party to execute and deliver all documents and do all things necessary or desirable to carry out the purposes of the agreement. Section Thirteenth gives certain restricted rights to Kasey to mine named minerals from certain named claims. Section Fourteenth provides for assignability and inheritability of the rights of each party.

After a 33-day trial and numerous extended motions and countermotions the court in general substance found that the claims called Sleeper Number 1, Somnabulist Number 3 and Dymius (excepting the westerly 100 feet of Dymius) were valid claims and that Kasey is entitled to the contract royalties therefrom as to those portions thereof which do not overlap Onessa Number 4, Sulphide Queen Number 2, Sulphide King Number 1, Lead Mountain Numbers 2 and 3 and Wash Queen Number 2. The court further found that the claims called Somnabulist Fraction Number 1, Sleeper Number 4, Dymius Number 1 and Lanthan Number 1 are not valid claims.

Not specifically mentioned in the pleadings but necessarily involved in the question of payment of royalties was the question of whether or not extralateral rights of Company through alleged apexing of veins on Sulphide Queen claims outside of Wash Queen would affect the right of Kasey to royalties from minerals mined on Wash Queen. In this respect the court found in substance that the contract between the parties had abridged for royalty purposes, as between these parties, any extralateral vein rights that Company might try to use for the purpose of evading payment of royalties to Kasey.

All decisions in this case necessarily depended to some degree on the priority and validity of the various claims since

all of the Sulphide Queen claims, as well as Onessa Number 4 and Betty Ann, are to some extent overlapped in crazyquilt fashion by one or more of the Primary claims.

Kasey first contends that Section Fifth is ambiguous and that extrinsic evidence should have been received to explain its meaning. Kasey further contends in this respect that the meaning given Section Fifth by the trial court is not correct. As a further adjunct to this point Kasey contends that they offered certain evidence to show consideration, and that it was improperly rejected. A reading of the whole contract convinces us that the trial court was right in holding Section Fifth to be clear and unambiguous. It is true that whenever the meaning of a contract is uncertain or doubtful, evidence of extrinsic circumstances may be received to clarify the intent of the parties in the contractual language which they used. (*Walsh* v. *Walsh,* 18 Cal.2d 439, 443 [4] [116 P.2d 62].) It is also well established, however, that if upon a reading of the whole contract the portion of the contract under attack is clear and explicit no extrinsic evidence will be received to vary its plain terms. As was said in *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 760 [2] [128 P.2d 665] :

''The fundamental canon of construction which is applicable to contracts generally is the ascertainment of the intention of the parties (Civ. Code, § 1636), and in accordance with section 1638 of the Civil Code, the language of the agreement, if clear and explicit and not conducive to an absurd result, must govern its interpretation.''

From a reading of the contract it readily appears that the parties owned unpatented claims in the same general area; that there was already pending certain litigation between the parties or their predecessors in interest; that doubt existed as to the validity of some of the claims of both parties; that Company proposed to buy all claims and appurtenant rights then owned or that might be thereafter acquired by Kasey within a 10-mile radius of a point near the center of the area of the claims referred to; that Company agreed to pay a total of $150,000 for the option and deeds of conveyance from Kasey; that Company was not to be estopped to challenge the validity of any Kasey claims by reason of the option or the exercise thereof; that Kasey would consent to a judgment quieting Company's title to all of Sulphide Queen claims but that such consent should not prejudice Kasey's rights to receive royalties as provided by Section Fifth. Section Fifth,

as has hereinbefore been noted, excludes the Sulphide Queen claims from the payment of royalties. However, one of these Sulphide Queen claims was the Wash Queen claim, and the parties desired that if any Kasey Primary claims were good and valid claims and overlapped the Wash Queen claim in a place where the Wash Queen claim was not superimposed on one of the other Sulphide Queen group, royalties would be paid to Kasey from minerals mined from such restricted area.

While a cursory reader or a person whose reading was colored by desire might attribute or imagine other meanings, a close and careful reading and rereading of the paragraph involved in connection with the whole contract inevitably brings the mind back to the same conclusion, to wit, that which was arrived at by the trial court. That the facts are complicated and require extended and careful wording, and a careful reading for understanding does not make the contract ambiguous.

It is true that where the trial court has interpreted a contract without resort to extrinsic evidence this court is not bound by that interpretation. But a corollary of that rule is that where such interpretation is one of two or more equally reasonable interpretations this court will accept that which is adopted by the trial court. (*Teater* v. *Good Hope Development Corp.*, 14 Cal.2d 196, 210 [6] [93 P.2d 112] ; *Lundin* v. *Hallmark Productions, Inc.*, 161 Cal.App.2d 698, 701 [1-2] [327 P.2d 166].)     We are also well aware of the rule cited by Company that

''Where a contract is susceptible of two interpretations, one of which is reasonable and fair, and the other is unreasonable and unfair, the latter interpretation must be rejected and the first accepted.'' (*Division of Labor L. Enforcement* v. *Safeway Stores*, 96 Cal.App.2d 481, 490 [3] [215 P.2d 773].)

However, we are not only convinced from a careful study of the whole contract that the trial court's interpretation was the only reasonable one that could be placed on Section Fifth, but we are also convinced from a review of all the evidence that no unfair result ensues to either party from such interpretation.

Kasey further contends that parol evidence was receivable in any event in clarification of alleged ambiguity of Section Fifth, because such section has to do with consideration and that the true consideration may always be shown by extrinsic evidence, citing *Simmons* v. *California Institute of Technology*, 34 Cal.2d 264 [209 P.2d 581]. The trouble with

this theory is that there was in the case at bar no dispute over just what the executed portion of the consideration was. The dispute is with respect to the *executory* promises, and the rule is clear that parol or extrinsic evidence will not be admitted to vary or add to those promises and thus change the fundamental character of the agreement. (Witkin, California Evidence, 407; *Harding* v. *Robinson,* 175 Cal. 534, 542 [166 P. 808]; *Koeberle* v. *Hotchkiss,* 4 Cal.App.2d 252, 256 [40 P.2d 911]; *Van Fleet-Durkee* v. *Oyster,* 91 Cal.App.2d 411, 414 [3b] [205 P.2d 32].)

Next Kasey contends that Company is required to pay royalty from within that part of Onessa Number 4 that overlaps Wash Queen. Kasey supports this contention by citing the general rule that a vendee in possession under an executory contract cannot challenge his vendor's title without surrendering possession, and cites *Cassin* v. *Nicholson,* 154 Cal. 497, 506 [98 P. 190] and *Butler* v. *Woodburn,* 19 Cal.2d 420 [122 P.2d 17]. And the corollary of that rule, i.e., if the vendee in possession buys in an outstanding title the newly purchased title merely perfects the title of the vendor, and the perfected title inures to the benefit of the vendor for all purposes, provided that the vendor must, when equity requires it, reimburse the vendee for the expense of acquiring the perfected title. (*Garvey* v. *Lashells,* 151 Cal. 526, 533 [91 P. 498].) But the position thus taken by Kasey completely ignores the plain wording of Section Ninth, which provides that Company had not made an examination of the validity of Kasey's claims and that neither the execution of the agreement nor the exercise of the option will prejudice the right of Company to contest the validity of any of the Kasey claims. As has been pointed out in *Kasey* v. *Molybdenum of America,* 4 Civil 5902, *ante,* p. 346 [1 Cal.Rptr. 393], filed this day by this court, a stipulation in an executory contract of sale that the vendee is not estopped by such contract to challenge the vendor's title renders unnecessary the surrender by the vendee of possession as a prerequisite to challenging the vendor's title where the vendor's title was bad *ab initio*. Under the facts here at bar, although the contract, taken as a whole, undoubtedly means that Company has reserved to itself the right to attack any Kasey claim on the ground that prior intervening rights are held by itself or by third parties, this is not to say that Company may use the possession it acquired under the contract to perfect for its own benefit technically invalid but perfectable Kasey claims. Thus, in the case of

Sleeper Number 4, Dymius Number 1 and Lanthan Number 1, the basis of the trial court's ruling of invalidity was that the last above-named claims were invalid *ab initio* because of lack of good faith or because not located on open public land or because located in direct contravention of the requirements of law. As to these three claims the court found that Kasey never had a valid title in the first place and that finding is supported by evidence. Paragraph Ninth therefore freed Company from the need to restore possession before questioning Kasey's title. The title to these three claims was bad even though Kasey remained in possession, as there was nothing Kasey could have done to perfect their alleged title. We are, therefore, in accord with the ruling of the trial court as to Sleeper Number 4, Dymius Number 1 and Lanthan Number 1.

As to Somnabulist Fraction Number 1, however, the facts present a somewhat different picture. The original location of this claim was admittedly valid. Onessa Number 4 nowhere overlaps Somnabulist Fraction Number 1. The court, on sufficient evidence, found that the Wash Queen claim as originally located covered no part of the area of the Wash Queen mining claim as said boundaries were monumented on the ground on June 11, 1951, at the time the contract was entered into. In other words, Wash Queen claim was a floated claim and not valid as located on the ground insofar as Kasey's right to the original location to Somnabulist Fraction Number 1 and was insufficient to bar, of itself, the validity of the original location of Somnabulist Fraction Number 1. It follows that if Kasey had remained in possession and had done their discovery and assessment work before the rights of any third party intervened, the claim could have been perfected. (*MacDonald* v. *Midland Mining Co.*, 139 Cal.App.2d 304, 309 [3-4] [293 P.2d 911].) As we have pointed out in *Kasey* v. *Molybdenum, supra,* the evidence will not support a finding that Company did not take possession of Somnabulist Fraction Number 1 under the option contract. The option contract was entered into on June 11, 1951, and during all of the time from then until September 21, 1951, was clearly executory in character. The Betty Ann claim was located by Company's agent at Company expense on July 22, 1951, during this unquestionably executory period. We think the terminology of the contract itself would adequately estop Company from denying that its possession of Somnabulist Fraction Number 1 was under the contract and was, therefore, the

possession of Kasey. At the time of the location of Betty Ann (so as to overlap Somnabulist Fraction Number 1) Company gave no notice whatever to Kasey nor did anything to suggest to Kasey that the Betty Ann location was in derogation of the Kasey title to Somnabulist Fraction Number 1. We are convinced, therefore, that insofar as royalty purposes are concerned Company's possession of Somnabulist Fraction Number 1 was undisputedly under the contract, that the location of Betty Ann was made possible (insofar as Somnabulist Fraction Number 1 is concerned), in part, by reason of such possession, and that equitable considerations discussed in many of the cases cited require such location to inure to the benefit of Kasey for royalty purposes. Company has not cited, and we have not found, any authorities which involve the particular kind of situation here presented and none of the authorities are in contravention of the principles hereinbefore enumerated.

As to the point raised by Company by its appeal wherein it contends that its extralateral rights from any apexing of a vein on a Sulphide Queen claim outside of Wash Queen, would bar the requirement of royalty payment to Kasey from minerals or that portion of such outside apexed vein as might be found in the Wash Queen claim, we are unable to agree with Company's contention. None of the authorities cited by Company present a contractual situation in any way similar to that of the case at bar, and they are not persuasive. It is apparent to us from a reading of the entire contract that the parties were as careful as they possibly could be to explicitly provide that royalties would not be paid from any of the Sulphide Queen group, except Wash Queen. Our interpretation of Paragraph Fifth, from an examination of the entire contract, convinces us that by the terminology of Paragraph Fifth the parties sought to eliminate all litigation between themselves on the subject of extralateral rights by defining and delimiting the royalty payments to the area particularly specified by the contract. We are satisfied that the trial court's interpretation is correct.

The findings and judgment of the trial court will be modified to include among the Primary claims found valid Somnabulist Fraction Number 1, and to exclude that claim from among the claims found invalid. In all other respects the judgment is affirmed. It is ordered that the cost of the reporter's and clerk's transcripts on appeal will be borne

equally by the parties hereto. All other costs will be borne by the party incurring the same.

Griffin, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied January 13, 1960, and the petition of defendants and appellants for a hearing by the Supreme Court was denied February 10, 1960.