[Civ. Nos. 28213-28215.   Second Dist., Div. Two.   Aug. 23, 1965.]

BOB FEINBERG, Plaintiff and Appellant, v. TEITEL-BAUM FURS, INC., et al., Defendants and Respondents.

(Consolidated Cases.)

Sidney E. Horvitz, Irmas & Rutter, William A. Rutter and Howard B. Miller for Plaintiff and Appellant.

Leland, Hoffman & Kalik and Horace L. Kalik for Defendants and Respondents.

ROTH, P. J—Appellant Feinberg was the owner of trade acceptances in the total amount of $57,724.75,[1] drawn on respondent Teitelbaum Furs, Inc. (Corporation) most of

---

[1] Although Feinberg did business under the name of Rifkin & Feinberg, he appears as the sole plaintiff and the sole owner of the trade acceptances here involved.  It is clear from the record that in respect of said trade acceptances, Rifkin was at all times acting and speaking for appellant.  Rifkin also testified that although his name appeared in the firm name, he had no ownership.  It is also clear that Rifkin referred to as ''Ruby,'' was the *alter ego* of Feinberg in all transactions and occurrences referred to in the opinion.

which were personally endorsed by respondent Albert Teitelbaum (Teitelbaum). He brought three separate actions (consolidated actions) to recover that amount. In addition, appellant was the owner of a promissory note for $5,000, executed by Teitelbaum and his wife, dated October 8, 1956, upon which a fourth action was predicated. The fourth action and the consolidated actions were all tried at the same time.

A judgment was entered in the consolidated actions in favor of respondents for costs. The judgment in favor of respondents was predicated on the finding of the trial court that Feinberg accepted $14,431.06, together with the promissory note for $5,000 upon which the fourth action is based, in full satisfaction for his claim.[2]

In the fourth action judgment was entered for appellant in the sum of $3,750, the unpaid balance on the $5,000 promissory note.

This appeal is from the judgments for respondents in the consolidated actions.

The sole issue is whether there is substantial evidence to support the trial court's findings detailed in footnote 2, that appellant had settled the total amount of his trade acceptances for one fourth of the total paid to him in cash on October 24, 1956, plus the promissory note for $5,000 delivered to him on the same day.[3] Appellant argues that the only

[2] "8. On October 8, 1956, a promissory note in the sum of $5,000.00 was drawn to the order of Harry Rapoport and executed by the individual defendants, Al and Sylvia Teitelbaum. The sole consideration for this note was plaintiff's agreement, effected by Rapoport, with the full knowledge and consent of plaintiff, to accept a payment of twenty-five percent (25%) in full payment, satisfaction and discharge of the past due trade acceptances like all other creditors. The said $5,000.00 note was delivered by Al and Sylvia Teitelbaum to Rapoport for plaintiff, and in turn endorsed and delivered by Rapoport to plaintiff on or before October 24, 1956 with the knowledge of Al and Sylvia Teitelbaum.

"9. On October 24, 1956, pursuant to the aforesaid agreement upon which the $5,000.00 note was executed and delivered, the plaintiff received and accepted the sum of $14,431.06 from Teitelbaum Furs, Inc., being twenty-five percent (25%) of the full face amount of the trade acceptances held by plaintiff. By reason thereof, the trade acceptances in issue have been satisfied and discharged. The payment of $14,431.06 was received and accepted by plaintiff, together with the $5,000.00 note, in full payment, satisfaction and discharge of plaintiff's claim upon the trade acceptances and in complete discharge of defendants' liability thereon."

[3] The time when the $5,000 note was delivered to appellant, as related to appellant's acceptance of the $14,431.06 check, is important, but the testimony thereon is deliberately vague. Rifkin testified. "Q. And in point of time, which did you receive first? A. I don't remember; around the same time."

evidence in the record which supports the finding of the trial court is in violation of the parol evidence rule. Findings based thereon, he urges, are legally insufficient.

Primarily because of a substantial robbery suffered by the Corporation in 1955, the trade acceptances here involved, as well as many others, plus additional obligations of the Corporation were not paid when due. The creditors of the Corporation met and appointed a creditors' committee in the hope that insurance proceeds which the Corporation expected as a result of the robbery, would be collected and the Corporation thus be enabled to pay its obligations. The committee met on May 15, 1956, and approved an extension agreement for monthly payments on their respective claims. One payment of 2½ per cent was made under this extension agreement. Appellant participated in this payment. Shortly thereafter, Teitelbaum was convicted for complicity in the robbery. On July 15, 1956, the creditors abandoned any hope of realizing payment to themselves from the extension agreement, and it was abandoned.

Thereafter, creditors, with the assistance of Teitelbaum, commenced negotiations for the sale of the Corporation and other Teitelbaum corporations to a new corporation, which would bear the name of Teitelbaum of Beverly Hills, Inc. The purchasers were third parties. One of the terms of this purchase and sale agreement executed on August 9, 1956, and amended on October 12, 1956 (August Contract) was that the purchasers would proceed with the transaction on the condition that all of the outstanding creditors of Corporation (totaling $642,250 in claims) would settle their claims against Corporation on the basis of 25 per cent to be paid in cash out of monies deposited by purchasers in an escrow established to consummate the deal, and that this escrow would not be closed unless all creditors accepted. For approximately three or four weeks after execution of the August Contract, appellant let it be known verbally and by letter, that he would not accept 25 cents on the dollar. Thereafter, appellant's statements and conduct became ambiguous. On September 4, 1956, through his attorneys, he wrote to Corporation and the escrow and advised he would accept nothing less than full payment. On September 11, he wrote to the attorneys of purchasers and said that he was withdrawing the letter of the 4th from the escrow and would accept a 25 per cent payment from the escrow, but would not release the principal obligors on the trade acceptances. On October 17,

1956, he wrote to the attorney for the Corporation and Teitelbaum that he would accept 25 per cent from the escrow if payment were made in 10 days from the date of the close of escrow, which had been fixed as October 24, 1956, but would retain his claim against the principal obligors.[4]

Except for the letters mentioned, appellant permitted Rifkin and Rapoport to speak for and represent him in all transactions which the creditors had with Corporation, with Teitelbaum, and the purchasers under the August Contract. Even as to the letters the record is not clear as to whether the attorney writing them for appellant was directly authorized by appellant or by Rapoport.

The trial court found on ample evidence that appellant ". . . authorized and permitted Rapoport at all times, to deal with the trade acceptances with [appellant's] full knowledge and consent. . . ." The record abounds with evidence that Rifkin acted in a like capacity.

Rapoport too was the person to whom the trade acceptances owned by appellant had been originally issued. These trade acceptances had been endorsed by Rapoport prior to the time appellant by mesne assignments acquired the same.[5] Rapoport was in addition a creditor in his own right to the extent of $139,000.

Obviously, appellant's attitude, as reflected by the three letters mentioned, and other evidence not detailed, interfered with the consummation of the sale.

On October 23, 1956, Teitelbaum, in an effort to cure the situation, made an agreement with Rapoport of which Rifkin was completely aware, covering the note dated October 8, 1956, for $5,000 previously delivered to Rapoport. The agreement is as follows:

"This will confirm our verbal understanding as follows:

"I was and am aware of the fact that you have rendered very substantial services in arranging for the creation and

---

[4]Teitelbaum testified: "A. . . . Ruby had an idea that we could make [purchasers] responsible, if I was responsible; if I could be made responsible, . . . and we could collect from them. Q. Well, sir, is it not true that a suit was filed . . . on this very basis? A. Yes. . . . A suit was filed. It was never prosecuted. We filed it on the basis that if, by some chance, I should be liable, which we could not see, that they, in turn, would have been liable."

[5]Appellant and Rapoport, who is a defendant and cross-complainant, stipulated at the outset that appellant was the owner of the trade acceptances and promissory note herein detailed, but that appellant is the trustee for the benefit of Rapoport of any recovery in excess of $18,568.94, and that Rapoport was released and discharged of any claims appellant had against Rapoport.

financing of Teitelbaum of Beverly Hills, Inc. so that it could enable Teitelbaum Furs, Inc., a California corporation, Teitelbaum Furs, Inc., a New York Corporation, and Teitclbaum Furs of Palm Springs, Inc., a California corporation, to sell certain assets to Teitelbaum of Beverly Hills, Inc., and to offer their creditors a 25% composition, and in analyzing and inventorying the assets of the sellers. I fully realize that you have made certain financial sacrifices in connection with this matter, and that such sacrifices have benefitted the foregoing seller corporations in which I am principally interested as owner of capital stock, and that you are not being adequately compensated for your sacrifices under the proposed agreement of October 12, 1956 between Al Teitelbaum, Teitelbaum of Beverly Hills, Inc., Harry Rapoport, and Note Holder, as amended by agreement of October 23, 1956.

"In consideration of the foregoing, *and other good and sufficient consideration, and by way of inducement to you to execute the proposed aforesaid agreement as amended,* dated ~~October 8, 1956~~ [*sic*] *I concurrently deliver to you* my promissory note dated October 8, 1956, payable to you or your order in the sum of Five Thousand Dollars ($5,000.00).

"I understand and agree that my liability under said note, shall not be affected by any release from liability granted to me in connection with said proposed agreement of ~~October 7, 1956.~~ [*Sic.*]

"Please indicate your acceptance of the stated understanding between us, by signing and returning to me the copy of this letter understanding." (Italics added.)

Rapoport signed and accepted.

The $5,000 note mentioned was delivered by Rapoport to Rifkin. The note found its way into the hands of appellant and appellant alone predicated his fourth action upon his sole ownership of this note. The note was delivered on the same day, to wit: October 24, when appellant received his check from the escrow for $14,431.06. Rifkin was asked when with respect to said check. He was vague. (Fn. 3.) Rifkin was asked what he paid for the $5,000 note. He testified: "Q. . . . [D]id he sell you the note, . . . or did he give it to you? A. I took the $5,000 note exactly the same way I treated the trade acceptances." He later testified that any sums collected on the note were to be held for Rapoport.

The consideration detailed in the second paragraph of the letter dated October 23, appears to be as follows:

(a) Rapoport "rendered very substantial services . . . in

financing of Teitelbaum of Beverly Hills, Inc. . . .'' (the purchasing corporation), so that it could acquire Corporation and other Teitelbaum properties and thus bring about an offer of a 25 per cent composition with Corporation's creditors;

(b) Rapoport helped analyze and inventory assets of the Seller in the August Contract;

(c) Rapoport made financial sacrifices of which Teitelbaum was the beneficiary, since Teitelbaum was the owner of the capital stock of Corporation and the other properties which were being turned over to the purchasers in the August Contract.

Teitelbaum was permitted to testify over objection that he wrote the October 23d letter because he expected Rapoport to secure appellant's assent to the 25 per cent payment in full settlement of appellant's trade acceptances in consideration of Teitelbaum's $5,000 note. Teitelbaum also testified that at a meeting between himself and Rapoport, a verbal agreement was entered into between himself and Rapoport, whereby Rapoport agreed on behalf of appellant to accept a 25 per cent payment in full settlement and discharge of the trade acceptances held by appellant if Teitelbaum would deliver the $5,000 note to him.

The record is barren of any testimony showing how Rapoport rendered substantial services to the purchasers in the August Contract, or what financial sacrifices he made which were in any way different from those made by all the creditors. One Somper, a supervisory employee of Corporation, testified that the work of inventory and analysis of Corporation's assets were completed by himself, and there is no evidence that Rapoport analyzed and inventoried assets in a manner different from that in which any of the creditors analyzed and inventoried the same to determine whether or not the August Contract was fair. The trial court indicated a disbelief that any of the items (a), (b) or (c) were any part of the consideration for the $5,000 note. The record persuades us that the trial's court incredulity was well-grounded.

Mr. Somper testified he was present in Mr. Teitelbaum's office on October 23 when Mr. Teitelbaum met with Rapoport, and that Rapoport asked Teitelbaum to execute the $5,000 note, which he , in turn, would give to Mr. Rifkin. Rapoport stated, according to Somper, that if Teitelbaum executed the note, Rifkin would go along with the settlement and that he would have no further trouble with him. Somper then testi-

fied that he saw Mr. and Mrs. Teitelbaum sign the note and that Rapoport said he would turn the $5,000 note over to Mr. Rifkin.

Mr. Rifkin testified that sometime in the middle of October 1956, Teitelbaum had told him about the $5,000 note he had delivered to Rapoport, and that he said to Rifkin: "Ruby . . . see that you get it and I will work out payments to you."

Appellant asserts that even at the time the escrow was closing, Rifkin (appellant was not present at any of the events here detailed and did not testify) insisted that appellant was not accepting 25 per cent in full payment of his claim and that when a check for 25 per cent of the amount was delivered to him, he insisted that he would accept it, only if the attorney for Teitelbaum endorsed the check "To be applied as partial payment of those certain notes and trade acceptances of Teitelbaum Furs, Inc. which have been endorsed by A. Teitelbaum or Al Teitelbaum individually.

A portion of Teitelbaum's testimony set up in footnote 4 is indicative of Rifkin's reasoning at the time he insisted on the endorsement and Rifkin himself testified there was ". . . a lot of intrigue; . . ."

The record does show contradictions. While appellant through his attorney was saying one thing, his agents and associates were saying and doing something else. The trial court had a question of fact before it which was peculiarly the province of the trial court to resolve. This, the trial court did by the findings 8 and 9 heretofore referred to in footnote 2, and there is ample direct evidence and abundant inference to support the findings of the trial court.

The evidence in respect of the $5,000 note and the purposes for which it was given, was proper and its admission is not in violation of the parol evidence rule.

Appellant argues that evidence in respect of the $5,000 note varies the terms of the letter of October 23 and that parol evidence cannot be used to prove additional or different provisions of a written contract on the theory that they are a part of the true consideration. (Witkin, Cal. Evidence (1958) p. 407, Documentary Evidence, § 365; *Harding* v. *Robinson,* 175 Cal. 534, 537 [166 P. 808]; *Arnold* v. *Arnold,* 137 Cal. 291 [70 P. 23]; *Molybdenum Corp. of America* v. *Kasey,* 176 Cal.App.2d 357 [1 Cal.Rptr. 400]; *Langan* v. *Langan,* 89 Cal. 186 [26 P. 764]; *Koeberle* v. *Hotchkiss,* 4 Cal.App.2d 252 [40 P.2d 911]; *Mulholland* v. *Parker,* 26 Cal.

App.2d 107, 110 [78 P.2d 1045]; *W. R. Campbell Co.* v. *Sears Roebuck & Co.,* 136 Cal.App. 765, 768 [29 P.2d 910].)

Appellant admits, however, that parol evidence can be used to vary a recital of an instrument in order to show true consideration. The sole question before us is what was the true consideration for the $5,000 note and none of the cases cited by appellant are applicable.

All of the cases cited by appellant concede the principle enunciated in *Robinson, supra,* and codified before that case in section 1962, subdivision 2 of the Code of Civil Procedure. In *Robinson, supra,* at page 537, the court reiterates: "The truth of the facts recited in a written instrument is conclusively presumed between the parties thereto . . . but this rule does not apply to the recital of a consideration."

When the October 23d letter together with the $5,000 note were delivered to Rapoport, the strong inference is that the consideration, to wit: appellant's consent to accept 25 per cent in full as required for the consummation of the August Contract, had in fact been obtained.

The recitals of alleged consideration in the October letter heretofore itemized as (a), (b) and (c), were obviously window-dressing and they are not sustained by any credible evidence. When it is borne in mind that Rapoport was himself a creditor to the extent of $139,000, and that he was at all times concededly acting for appellant, it seems clear from the recital in the third paragraph of the October 23d letter, even without parol evidence, that the true consideration recited in the October letter was Rapoport's agreement for himself and Feinberg to consummate the August Contract. Rapoport was privy to the August Contract and had a large stake in its consummation. He knew that it could not be consummated unless all the creditors participated according to its terms.

The emphasized portion of the October 23d letter shows clearly that the real consideration was to induce Rapoport and the claims he represented, which included appellant's, to go along with the August Contract. When it develops, as it has without contradiction, that the $5,000 note ended up in appellant's possession, and that appellant paid Rapoport nothing for it, it is difficult to rebut the inference that Rapoport was representing both himself and appellant when he agreed to the October letter and accepted delivery of the $5,000 note.

In addition, Rapoport had endorsed the trade acceptances

752

which appellant held. In this respect, as noted, Rapoport originally was a party to these proceedings in the trial court. Finding 13 in the consolidated actions: "By stipulation . . . all claims between . . . Feinberg and . . . Rapoport are fully discharged, and plaintiff is not entitled to any recovery against Rapoport;" is a consummation of the stipulation set out in footnote 5.

Whether or not Rapoport participated in the proceeds of the $5,000 note is arguable. It is clearly inferable that the delivery of the total $5,000 note from Rapoport to appellant played some part in the settlement between Rapoport and appellant, resulting in the finding quoted above, whereby Rapoport escaped liability on his endorsement of the trade acceptances to appellant. However, how appellant and Rapoport treated the note between themselves, we consider immaterial to the point at issue.

Even if it be assumed that strict interpretation of the parol evidence rule demonstrates the intention of the nominal parties to the October 23d letter to limit the elements of consideration to items (a), (b) and (c) outlined in the second paragraph of the October 23d letter, the parties to the letter either defeated that intention or more fully expressed their full intention when in the third paragraph they included the phrase "and other good and sufficient consideration." The least that can be said is that an ambiguity was created. In our opinion it was not an ambiguity, but a clear statement that the $5,000 note was for something other than (a), (b) and (c) set out in the second paragraph.

It is settled that the introduction of parol evidence to show consideration in addition to that recited in the instrument is proper, when phrases such as "other valuable considerations", "part of the consideration", or "other good and sufficient consideration", are used. (*Wells* v. *Wells,* 74 Cal. App.2d 449 [169 P.2d 23] ; *Weil* v. *California Bank,* 219 Cal. 538 [27 P.2d 904].) The language in paragraph three of the letter of October 23 ". . . and other good and sufficient consideration . . ." clearly falls within any one of the quoted phrases.

In *Wells, supra,* at page 456, the court says: "The function of all interpretation is, of course, to try to ascertain the true intent of the parties. Parol evidence should not be admitted to vary, to add to, or to subtract from the terms of a written agreement, but it should be, and is admissible, to explain what the parties meant by what they said.

753

"We do not find it necessary to determine whether the limited or the more liberal rule is in force in this state. This is so, because, in the instant case, even under the most limited rule, parol evidence was admissible to interpret the contract. The first sentence of the agreement refers to 'other valuable considerations.' It is elementary, of course, that the true consideration may always be shown by parol." (P. 457.)

It was proper for the trial court to admit parol evidence, to explain the meaning of the term "and other good and sufficient consideration" contained in the October 23d letter.

The judgments are affirmed.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied pursuant to rule 27(e), California Rules of Court. Appellant's petition for a hearing by the Supreme Court was denied October 20, 1965.