[Civ. No. 5902. Fourth Dist. Dec. 17, 1959.]

J. BRYANT KASEY, Appellant, v. MOLYBDENUM CORPORATION OF AMERICA (a Corporation) et al., Respondents.

Scudder & Forde and Guy Richards Crump for Appellant.

Schultheis & Laybourne, Everett B. Laybourne, Lonergan & Jordan and John B. Lonergan for Respondents.

SHEPARD, J.—This is an action for declaratory relief respecting plaintiff's alleged right to use certain roads and develop certain ore deposits in the Clark Mountain Mining District of San Bernardino County; for an injunction to prevent interference with such rights; and for the determina-

tion of the title of the parties to certain mining claims. By answer and cross-complaint defendants deny the existence of the public character of the roadways (except Highway 91); the right of plaintiff to use the same; deny plaintiff's right to work certain claims as alleged in the complaint; allege exclusive title in themselves and characterize plaintiff as a trespasser. After judgment on the merits, plaintiff appeals.

From the record before us it appears that during the years 1924 to 1950, 12 lode mining claims were located in a portion of the Clark Mountain Mining District of San Bernardino County under such names as Sulphide Queen Numbers 1 and 2, Lead Mountain Numbers 2, 3 and 4, East Extension; Wash Queen; Wash Queen 2; Hard Rock Queen and Sulphide King Numbers 1, 2 and 3. Defendant Molybdenum Corporation of America (hereinafter called Company) acquired these unpatented claims. In the year 1950, plaintiff J. Bryant Kasey, Maryann Kasey, his wife, and Julius A. Paskan (all of whom will hereinafter be referred to as Kasey) apparently located or acquired in the same general area some 20 lode mining claims under such names as Sleeper, Dymius, Somnabulist, Morpheus, Celanthus, Galenite, Neola, La Prase and Neodymius, together with nine placer mining claims with such basic names as Lantham Numbers 1 to 6, Alluvium 1 and Aqua.

Some overlapping occurred between part of the Kasey claims and part of the Company claims, and the parties or their predecessors in interest were involved in disputes and litigation, the character and extent of which is not clearly shown by the record. On June 11, 1951, Kasey and Company entered into an option agreement (hereinafter referred to as Contract) wherein Kasey gave Company an option to purchase all of the above named claims (called in the Contract the "Primary Claims") and also the option to purchase all other claims (called "Secondary Claims"), mill sites and appurtenant rights and property located within a radius of 10 miles of the north quarter corner of Section 13, Township 16 North, Range 13 East, S.B.B. & M. Included in appurtenant rights were water rights, pipe lines, pole lines, *easements, rights of way,* improvements, tools and equipment located on or pertaining to the claims.

During the period of the option Company was granted the right of possession with the right to mine, explore and work the claims for testing purposes. Fifteen thousand dollars was paid for the option and $135,000 was to be paid upon the

exercise of the option and royalties thereafter on certain percentages of net production, which would finally terminate if the total royalties, plus original payments, reached the sum of $2,000,000. Kasey warranted that the primary claims were good, valid and subsisting claims and agreed to defend title as against all third parties in the event the option was exercised; agreeing further that Company might by consent take judgment in a then pending court action quieting Company's title in the Sulphide Queen group of claims as against any of the primary claims hereinbefore referred to, but provided further that such consent to a judgment quieting title should not prejudice Kasey's rights to royalties as elsewhere in said agreement provided.

The intent of three paragraphs of the agreement are of such importance in determining the issues here before us that their quotation appears advisable.

"NINTH: It is understood that Molybdenum has not made or completed an examination respecting the validity of the Primary claims or respecting the existence or value of any rare earth minerals therein and it is agreed that neither the execution of this Agreement nor the exercise of the option herein provided by Molybdenum shall prejudice or impair the right of Molybdenum to assert in good faith the invalidity of any of the Primary or Secondary claims or the exercise by Molybdenum of the full and complete rights of ownership of the Primary and Secondary claims, including, without limitation, the right to determine whether it shall mine (excepting only as otherwise specifically provided in Section FOURTH hereof), maintain or abandon any of said claims or any part thereof, provided, however, that if Molybdenum shall abandon any Primary claim or part thereof and relocate the same, such abandonment and relocation shall not relieve Molybdenum from any obligation it might otherwise have to pay royalty under the provisions of Section FIFTH of this Agreement.

"TWELFTH: Each of the parties hereto will make, execute and deliver all such affidavits, amended location notices, deeds, assignments, bills of sale, stipulations, authorizations, instruments, documents and papers, and will do such other acts and things, as may hereafter at any time, or from time to time, be necessary or desirable to carry out and effectuate the purposes of this Agreement.

"THIRTEENTH: Following the expiration of three (3) years after exercise of the option hereinabove provided in Section FIRST hereof, in the event the same shall be exercised, and

subject to all of the Molybdenum's rights under this Agreement, Owners may mine and remove from Morpheus No. 1, Morpheus No. 2, Morpheus No. 3, Morpheus No. 4, Morpheus No. 5, La Prase and Barito claims mica and the minerals contained in said mica other than any of the rare earths group, radio-active materials, radio-active elements and the yttrium group, and may mine and remove tungsten from the Barito claim. All of such mining and removal shall be conducted without interference with the activities or operations, or contemplated operations, of Molybdenum on said claims or elsewhere, and Owners will save and hold Molybdenum harmless from and against any and all liability or loss from or by reason of the acts or omissions of Owners upon said claims or any of them.''

On July 22, 1951, Company, after having discovered that Kasey had failed to do the required discovery work on Somnabulist Fraction Number 1 claim, to which Company later accepted a deed from Kasey under Contract, caused a new claim to be located named Betty Anne, the discovery point of which was on open public land and which embraced in its area all or part of other claims deeded by Kasey to Company, including the whole of Somnabulist Fraction Number 1 (a triangular parcel 60 x 65 x 80 feet in size). On April 9, 1955, Kasey crossed Company claims and attempted to locate a new claim called Sleeper Number 1 Annex, using as his point of discovery approximately the same location as the original point of discovery of Somnabulist Fraction Number 1. Company caused Kasey to be ejected, and erected barriers on roads leading through said claims. Kasey brought this action for declaratory relief and for injunction to restrain Company from interfering with Kasey's entry and development of Sleeper Number 1 Annex. Company cross-complained. Company claims title to all the lands in question by reason of Contract and the deeds given Company by Kasey on September 21, 1951, and also by the separate filing and improving of Betty Anne lode claim. Company further claims Kasey has only a personal right under section 13 of Contract; denies the existence of any public roads (except Highway 91) as alleged in Kasey's complaint, and claims that the transfer of all such easements to Company prevents Kasey from entering anywhere on its claims. By counter-claim and cross-complaint, Company affirmatively covers about the same ground except that it additioanlly puts in issue the title to Somnabulist Fraction Number 1.

The trial court found against Kasey's contentions as to the existence of public roads (except as to Highway 91); that Sleeper Number 1 Annex claim is invalid; that Betty Anne claim is valid; that Somnabulist Fraction Number 1 claim is invalid; that Kasey concedes that these findings were made on conflicting evidence (except to the extent that Betty Anne may be deemed a relocation of Somnabulist Fraction Number 1) and concedes the validity of such findings on appeal (except that he claims Betty Anne perfected for royalty purposes title of Somnabulist Fraction Number 1).

We need not consider, therefore, the attempted location of Sleeper Number 1 Annex claim nor the question of public or private road rights of way, and we are thus left with only two important questions.

Did the location of Betty Anne claim on July 22, 1951, inure to the benefit of Kasey insofar as the right to royalties from Somnabulist Fraction Number 1 are concerned?

What is the nature of Kasey's right to go upon certain mining claims to mine and remove mica and tungsten as is described in Paragraph Thirteenth of Contract?

The question of whether or not the location of Betty Anne claim inured to the benefit of Kasey involves the application of rules of law which have been applied in California for more than 100 years, as well as the interpretation of the contract. The general rule first expressed respecting the rights of a vendee going into possession was expressed in the early case of *Hoen* v. *Simmons* (1850), 1 Cal. 119, 120 [1] [52 Am.Dec. 291], in the following language:

"The defendants, having entered into possession, claiming under the plaintiff and in subordination to his title, are estopped from questioning it. Their position is similar to that of a tenant, who cannot gainsay or deny the title of his landlord, without having first restored the possession."

It has been uniformly followed and extended since that time.

"When the purchaser does not obtain the title which the deed purports to convey and the covenants embrace, and he goes into and retains possession under the deed, and the failure of the title goes to the entire consideration paid, or to be paid, for the land, then he must seek his remedy by a rescission of the contract, alleging a paramount outstanding title in another, and offering to re-deliver the possession, and account for the rents and profits. In such case he cannot be permitted to retain possession of the land, and denied the

title under which he entered." (*Walker* v. *Sedgwick*, 8 Cal. 398, 402 [1].)

Many more cases repeated the rule in the nineteenth century, and in 1907 in *Garvey* v. *Lashells*, 151 Cal. 526, 531 [91 P. 498], the Supreme Court, quoting from an earlier case said:

" 'A purchaser of land in possession thereof under a contract of sale, by the terms of which the vendor is to give a warranty deed of the property, conveying a good and perfect title thereto, cannot, upon the vendor's failure and inability to convey a good and perfect title, retain both the land and the purchase money until a perfect title shall be offered him, but he must pay the purchase price according to the contract, and receive such title as the vendor is able to give, if he chooses to retain the possession of the land, or he may rescind the contract, restore the possession to the vendor, and recover the purchase money paid, together with the value of his improvements, after deducting therefrom the fair rental value of the premises; and if he fails and refuses to adopt either course, he is liable to an action of ejectment by the vendor.' "

Again, in 1942, in *Butler* v. *Woodburn*, 19 Cal.2d 420, 423 [1] [122 P.2d 17], our Supreme Court reiterated the rule in the following language:

"The general rule relied upon is one of universal application where the purchaser of land under an executory contract has entered into possession of the land according to the terms of the agreement. During the life of such a contract, a purchaser in possession of the land is estopped to deny the validity of his vendor's title for the purpose of defeating the agreement."

A minor coordinate of this rule is that a vendee who perfects the title of the vendor is entitled to reimbursement for the cost thereof. (*Crofoot* v. *Tarman*, 147 Cal.App.2d 443, 449 [305 P.2d 56].)

However, Company points to paragraph Ninth of Contract wherein it is stipulated that "neither the execution of this Agreement nor the exercise of the option herein provided by Molybdenum shall prejudice or impair the right of Molybdenum to assert in good faith the invalidity of any Primary or Secondary claims," and contends that such wording makes Company free to dispute Kasey's title at any time; that the Betty Anne location was a separate and distinct operation and in no way a relocation for the purpose of perfecting Somnabulist Fraction Number 1.

It is true that there is a generally recognized excep-

tion to the rule that a vendee in possession may not challenge the title of the vendor. That exception is reviewed in 51 Corpus Juris Secundum, Landlord and Tenant, section 268b, page 912, where it is said:

"No estoppel results where there is merely a conditional admission of title, or where it is stipulated in the lease, or otherwise, that the holding is without prejudice, . . ."

Different applications of this exception are found in *Gutierrez del Arroyo* v. *Graham,* 227 U.S. 181 [33 S.Ct. 248, 57 L.Ed. 472] (where the contract recognized an outstanding dispute of title) ; *Frye* v. *Gragg,* 35 Me. 29 (conditional admission of title) ; *Stratton* v. *Hanning,* 139 Cal.App.2d 723, 727 [5] [294 P.2d 66, 57 A.L.R.2d 344] (fraud or misapprehension of title) ; *Yuba River Sand Co.* v. *City of Marysville,* 78 Cal.App.2d 421, 425 [2] [177 P.2d 642] (landlord's cross-complaint to quiet title, fraud, mistake of title).

The question then is the proper interpretation of Paragraph Ninth as to its possible application to the facts in the case at bar. The position of this court on an appeal is well stated in *Lundin* v. *Hallmark Productions, Inc.,* 161 Cal. App.2d 698, 701 [1-2] [327 P.2d 166] :

"Whether a contract is, in any of its terms or provisions, ambiguous or uncertain is a matter of determination, in the first instance, by the trial court. This court is not bound by the trial court determination where such determination has been made without resort to extrinsic evidence. (Citations.)

"However, it is also the rule that where no extrinsic evidence has been introduced, the interpretation placed upon the contract by the trial court will be accepted by this court if such interpretation is reasonable, or if the interpretation of the trial court is one of two or more reasonable constructions of the instrument. (Citations.)"

The trial court by its ruling has held in effect that Company might challenge Kasey's title without surrendering possession and still further that it might do so by a newly created title based, in part, on the very possession it had received by contract from Kasey.

From an examination of all parts of the contract, in the light of the circumstances of the case at bar, we cannot agree that such an interpretation reasonably delineates the intention of the parties as evidenced by the contract. Company was the owner of 12 lode mining claims located in the same general area as the Kasey claims. Many of these claims

overlapped and it is clear from the evidence that title dispute and litigation preceded the execution on June 11, 1951, of the contract, although the full extent of that litigation is not made clear. The entire framework of the contract clearly indicates an effort by both parties to untangle the prior existing disputes and to turn over to Company all claims of every kind held by Kasey within a 10-mile radius of a designated point. Company, by paragraph Ninth, sought of course to retain intact such title as it already had. Although the contract, taken as a whole, undoubtedly means that Company has reserved to itself the right to attack any Kasey claim on the ground that prior intervening rights are held by itself or by third parties, this is not to say that Company may use the possession it acquired under the Contract to perfect for its own benefit technically invalid but perfectable Kasey claims. Nothing in the contract indicates to us that either of the parties contemplated the creation in Company of brand new titles, in the creation of which Company would use the possession it gained by Contract and thereby defeat a technically defective but perfectable title of Kasey. It follows that in the successive attempted relocations by Company (two of which were admittedly defective) ending up with the valid location of Betty Anne, Company did not then purport to deny the title of Kasey but was, in accordance with the provisions of the contract including Section 12, perfecting such title as far as royalty purposes under contract were concerned. (*MacDonald* v. *Midland Mining Co.,* 139 Cal.App.2d 304, 312 [6] [293 P.2d 911].)

Company has pointed to no evidence, and we have found none, that could reasonably support the conclusion that Company was not in possession through Contract of Somnabulist Fraction Number 1 at the time its agent located Betty Anne. Furthermore Company has not pointed to, nor do we find, any evidence that in any way justifies the conclusion that Company's agent in locating Betty Anne was not acting for Company. On the contrary, the facts testified to by Company's own manager of this particular area's mining operations show that the location, survey, the discovery work, the annual assessment work and improvement work were all done by agents in the pay of Company and at the expense of Company and under direction of Company. By paragraph Third, Company accepts from Kasey the right to take possession. In this connection it is worthy of note that Company contended before the trial court that Kasey was estopped to claim the validity

of Sleeper Number 1 Annex (attempted by Kasey to be located in 1955 with the same discovery point as Somnabulist Fraction No. 1) because the area of Somnabulist Fraction Number 1 was included in the contractual sale from Kasey to Company, and any new title acquired would inure to the benefit of Company. Thus, even at the time of trial, Company was still relying in part on its right of possession to Somnabulist Fraction Number 1 gained by the Contract of June 11, 1951.

Company makes no pretense that it or any third party (except the United States Government as title source) had any prior title to Somnabulist Fraction Number 1 at the time Company took possession under Contract, nor did Company at the time its agent made the location of Betty Anne purport to hold possession through any other party than Kasey.

At this point it is well to recall the wording of the last clause of paragraph Ninth, which, after authorizing Company to abandon any of the claims, goes on to say:

". . . provided, however, that if Molybdenum shall abandon any Primary claim or part thereof and relocate the same, such abandonment and relocation shall not relieve Molybdenum from any obligation it might otherwise have to pay royalty under the provisions of Section FIFTH of this Agreement."

Thus, while Company was under no obligation to perfect Somnabulist Fraction Number 1 and might abandon the same, nevertheless if it did relocate or otherwise perfect a defective title to a claim, the possession of which it had gained and held under Contract, it obligated itself to pay royalty on production therefrom.

The question of whether or not the right of Kasey to mine and remove mica and tungsten from certain claims as is described in paragraph Thirteenth of Contract is personal and nonassignable, or is an interest in realty, is of consequence only as it may affect inheritance, assignability and taxation, and the right to pass over other claims involved in the contract for the purpose of mining and removal of certain minerals. The trial court held that Kasey's right to traverse the claims deeded to Company by Kasey on September 21, 1951, was dependent upon the validity of those claims as of the date they were deeded, and that such right is circumscribed by the purposes and limitations expressed in Contract. With this ruling we agree. Of course, as has hereinbefore been explained, any defective titles that Company has perfected by new work dependent on the Company's possession through

Kasey would have inured to the benefit of Kasey. However, since the judgment of the trial court described Kasey's rights as set forth in paragraph Thirteenth as being "personal," and does not make clear the assignability, inheritability and taxability, it appears that a further clarification is desirable. Whether Kasey's rights are called a "servitude in gross" or a "profit *a prendre*," such rights have long been recognized in this state as a species of interest in land and as such assignable, inheritable and taxable. (*Callahan* v. *Martin,* 3 Cal.2d 110, 121 [3] [43 P.2d 788, 101 A.L.R. 871]; *Richfield Oil Co.* v. *Hercules Gasoline Co.,* 112 Cal.App. 431, 434 [1] [297 P. 73]; *County of Los Angeles* v. *Continental Corp.,* 113 Cal. App.2d 207, 226 [17] [248 P.2d 157].)

As has been hereinbefore pointed out, there is a clear obligation on the part of Kasey to pay Company a portion of the expense of locating and perfecting Betty Anne claim on account of the royalty benefit rights inuring to Kasey through Somnabulist Fraction Number 1 claim.

The judgment is reversed and the trial court is directed to make and enter new findings and judgment in accord with the views herein expressed, provided, however, that if the trial court finds it necessary, it may first take evidence on the expense of the location and perfection of Betty Anne claim as to that portion properly chargeable against Kasey, so as to make complete findings and judgment. Appellant to recover costs on appeal.

Griffin, P. J., and Mussell, J., concurred.