J. Bryant KASEY and Maryann Kasey, Appellants,

v.

MOLYBDENUM CORPORATION OF AMERICA, a corporation, Appellee.

No. 18695.

United States Court of Appeals Ninth Circuit.

Aug. 28, 1964.

J. Bryant Kasey, Maryann Kasey, Las Vegas, Nev., in pro. per.

Everett B. Laybourne, Dennis Keeley, Schultheis, Laybourne & Dowds, Los Angeles, Cal., for appellee.

Before BARNES, HAMLEY and DUNIWAY, Circuit Judges.

**562**

BARNES, Circuit Judge.

Appellants brought this diversity action in the district court for recovery of certain mining properties, for an accounting, and for damages. 28 U.S.C. § 1332.[1] Appellee raised the defense, inter alia, that the claim for recovery of the properties was barred by the five year statute of limitations of California Code of Civil Procedure § 318.[2] After a hearing limited to this particular issue, the district court concluded that the claim for recovery of property was so barred and entered judgment as to that claim pursuant to Fed.R.Civ.P. 54(b). Appellants appeal from that judgment. 28 U.S.C. § 1291. They are acting in propria persona, and this has complicated the appeal.

The facts, as found by the district court, are these: Appellants, as purported owners[3] of certain millsites, and named and unnamed unpatented mining claims, including all appurtenances and improvements thereto, entered into an option agreement with the appellee on June 11, 1951, whereby appellee, upon payment of $15,000, was given an option to purchase the properties for $2,000,000, "or such lesser amount as shall be payable hereunder." On September 2, 1951, appellee exercised the option, paying an additional sum of $135,000 pursuant to the terms of the option agreement, making a total of $150,000, and leaving a balance due of $1,850,000, which balance, according to the terms of the option agreement, was "payable, if at all, only when and to the extent that royalties shall become payable to the [appellants] * * *."

Upon the exercise of the option, and pursuant to the option agreement, appellants and their co-owner, on September 21, 1951, executed and manually delivered to appellee deeds conveying and granting to appellee these millsites and named and unnamed unpatented mining claims, including all appurtenances and improvements thereto. All of these deeds were unconditional and absolute in their terms. Since June 11, 1951, appellee has been in actual, continuous, exclusive, and uninterrupted possession of these properties.

We are also told that shortly after these conveyances, appellee paid appellants and their co-seller $50,000 as an advance on royalties. Appellee later paid appellants and their co-seller about $10,000 more in a series of three payments ending by December 31, 1952. No payments were made thereafter up to the commencement of the suit in 1959.

The district court concluded that from the date of the conveyance appellee owned any and all legal title to the properties which the vendors had had prior to the conveyances. The district court concluded that since appellants had not had seisin or possession within five years immediately preceding the filing of this suit (April 8, 1959), the action for recovery of the properties was barred by California Code of Civil Procedure § 318.

The parties have already engaged in several court actions concerning these claims. It is uncontradicted that in one series of state court actions the Kaseys consented to a judgment quieting title in Molybdenum to certain claims (denoted "Sulphide Queen" claims), which overlap some of the properties transferred

1. The district court found that appellants were citizens of California and that appellee was incorporated under the laws of Delaware. Although there was no explicit finding that appellee's "principal place of business" was elsewhere than in California, we conclude that such a finding is implicit in the district court's conclusion, unchallenged here, that "since the commencement of this action there was diversity of citizenship between plaintiffs and defendant." (C.T. 391)

2. "No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appears that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the property in question, within five years before the commencement of the action."

3. A third person also had an interest in the Kasey mining claims and sold his interest to appellee under the same option agreement, but he is not involved in this appeal.

in the conveyances of September 2, 1951. This consent was required by the option agreement if and when the option was exercised.

■ In another series of state actions by both the Kaseys and Molybdenum for declaratory and other relief, the California District Court of Appeal rendered judgments, now final, declaring some of the rights of the parties as to these properties. We take judicial notice of these officially reported decisions and refer to them for a better understanding of the complicated factual situation here existing. Kasey v. Molybdenum Corp. of America, 176 Cal.App.2d 346, 1 Cal.Rptr. 393 (1959); Molybdenum Corp. of America v. Kasey, 176 Cal.App.2d 357, 1 Cal. Rptr. 400 (1959).

■ The Kaseys also filed, on December 22, 1953, an action for damages and for rescission of the agreement in the United States District Court, Southern District, Central Division, under Civil No. 16147–T. In the hearing in the district court of the case at bar, the court and Molybdenum's counsel agreed that the district court should and could take judicial notice of the record in Civil No. 16147–T. The Kaseys made no objection. If the Kaseys had done so, Molybdenum's counsel could readily have put into evidence that file, certified by the district court clerk. Since the Kaseys did not object to the district court taking judicial notice of the record in Civil No. 16147–T as it existed in the clerk's office, we hold that the Kaseys waived any such objection, and we likewise take judicial notice of that record. From it we find that the action was dismissed without prejudice as to all plaintiffs on August 8, 1958.

In the case at bar, appellee has counterclaimed for alleged overpayment of royalties. Appellee has apparently also instituted a protective action in the state courts for recovery of that same alleged overpayment.

■ This is a diversity case, so we look to the law of California. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. 28 U.S.C. § 1652. Our duty is to arrive at an outcome "substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 109, 65 S.Ct. 1464, 1470, 89 L.Ed. 2079, reh. den. 326 U.S. 806, 66 S.Ct. 7, 90 L.Ed. 491. If appellants are barred by the statute of limitations from bringing their claims for recovery of these properties in the California state courts, appellants are barred in the district court. Guaranty Trust Co. v. York, supra.

Thus, the only issue here is whether the action for recovery of the properties is barred by California Code of Civil Procedure, § 318.

### I—*Is the Property Here "Real Property"?*

Ordinarily, one would think the answer would clearly be in the affirmative. But here the parties have offered arguments on this issue.

■ The property which the appellants wish to recover consists of (1) unpatented mining claims, (2) millsites, and (3) appurtenances and improvements thereto. A millsite is a small parcel of property used by the proprietor of a mine for mining or milling purposes, and is located generally,[4] but not necessarily,[5] on nonmineral land.

The California statutes do not expressly state whether mining claims, millsites, and appurtenances and improvements thereto are included within the term "real property."[6] California Code of Civil Procedure § 17, provides in part:[7]

"The following words have in this code the signification attached to

4. 30 U.S.C. § 42.

5. E.g., 30 U.S.C. §§ 524, 525; cf. generally, 33 Cal.Jur.2d, Mines and Minerals, §§ 112–13.

6. Some state statutes do. E.g.: Idaho Code § 5–203, Nevada Revised Statutes. §§ 11.060 and 11.080.

7. This same definition exists in California Civil Code § 14 and California Penal Code § 7.

them in this section, unless otherwise apparent from the context:

\* \* \* \* \* \*

2. The words 'real property' are coextensive with lands, tenements, and hereditaments." [8]

Although the legislature has not seen fit to expressly include mining interests within the definition of real property, the relevant case authority all points to the conclusion that mining interests are real property within the meaning of the statute. As early as 1863, in Hughes v. Devlin, 23 Cal. 501, the California Supreme Court stated:

"The defendant contends that the interest of miners in mining claims and ditch property upon the public lands, is not an estate of inheritance, or any of the other kinds of real estate mentioned in the statute; and therefore the same are not liable to be partitioned between the owners under the act. In this he is clearly in error. In Merritt v. Judd (14 Cal. [59] 64), this Court say [sic], in commenting on the Law of Fixtures: 'From an early period of our State jurisprudence, we have regarded these claims to public mineral lands as titles. They are so practically. Our Courts have given them the recognition of legal estates of freehold, and so, to all practical purposes—if we except some doctrine of abandonment, not, perhaps, applicable to such estates—unquestionably they are, and we think it would not be in harmony with this general judicial system, to deny to them the incidents of freehold estates, in respect to this matter.' So too, they have been held to be 'real property,'

respecting which a suit will lie under the two hundred and fifty-fourth section of the Practice Act, against a person claiming an adverse 'estate or interest therein.' (Merced Mining Co. v. Fremont, 7 Cal. [317], 319.) They are held to be real estate within the act relating to the place of trial of civil actions. (Watts v. White, 13 Cal. [321], 324.) So, too, they are held liable to levy and sale on execution, like other real estate. (McKeon v. Bisbee, 9 Cal. [137], 142.)" (23 Cal. at 505–06.) [9]

This reasoning alone would be adequate grounds for finding that these properties are real property.

But the court went on, stating, "The mere right to work such mines, is held to be an incorporeal hereditament in the land of other persons." (23 Cal. at 506.) Cf. Smith v. Cooley, 1884, 65 Cal. 46, 2 P. 880; Payne v. Neuval, 1908, 155 Cal. 46, 99 P. 476. If a right to work a mine is an hereditament in land, certainly a mining claim is not less of an interest in land. The right to take minerals from land is in the nature of a profit á prendre, which is an incorporeal hereditament. See the discussion in Callahan v. Martin, 1935, 3 Cal.2d 110, 118–22, 43 P.2d 788, 101 A.L.R. 871.

■ The court in Hughes v. Devlin, supra, concluded its opinion with words that have often since appealed to California courts: [10]

"Although the ultimate title in fee in our public mineral lands is vested in the United States, yet as between individuals, all transactions and all rights, interest, and estates in the mines are treated as being an estate

8. As enacted in 1873–74. As enacted in 1872, it read: "[t]he term 'land,' and the phrases 'real estate' and 'real property,' include lands, tenements, and hereditaments, and all rights thereto, and interests therein." West's Ann.California Code of Civil Procedure § 17 note. We see no significance in the changed wording.

9. Cf. also: Spencer v. Winselman, 1871, 42 Cal. 479; Tyee Consol. Min. Co. v.

Langstedt, 9 Cir. 1905, 136 F. 124; Lavagnino v. Uhlig, 26 Utah 1, 71 P. 1046 (1903), affirmed 198 U.S. 443, 25 S.Ct. 716, 49 L.Ed. 1119, and authorities cited at 71 P. at 1051.

10. E.g., Watterson v. Cruse, 1918, 179 Cal. 379, 382, 176 P. 870, 872; Buchner v. Malloy, 1909, 155 Cal. 253, 100 P. 687; Dalton v. Clark, 1933, 129 Cal.App. 136, 140, 18 P.2d 752.

in fee, and as a distinct and vested right of property in the claimant or claimants thereof, founded upon their possession or appropriation of the land containing the mine. They are treated, as between themselves and all persons but the United States, as the owners of the land and the mines therein * * *." (23 Cal. at 506.)

On the basis of this authority, as well as other authority,[11] (not having been cited to nor having found any authority to the contrary), we hold that the district court was not in error in assuming that the mining claims, millsites, and appurtenances and improvements thereto are real property within the meaning of §§ 318 and 17 of the California Code of Civil Procedure.

## II. Can the Statute Apply When the Claims are Unpatented?

The mining properties here are unpatented; that is, the fee simple title to the properties is still in the United States. Appellants contend that since paramount title still resides in the United States, the state statute of limitations cannot yet begin to run against their claim for recovery of the properties. For this proposition appellants cite a line of cases which hold that a state statute of limitations as to adverse possession does not begin to run against a patentee until after the patent is issued.[12] To hold otherwise would mean that the statute of limitations as to adverse possession was running against the United States. However, those cases do not stand for the proposition that the state statute of limitations cannot run against parties *other* than the federal government.

In fact, although appellants place reliance on Manly v. Howlett, 1880, 55 Cal. 94, 98, that court's full statement on the issue was:

"It is true that before the patent should issue, the Statute of Limitations might build up a title in the possessor as between the parties, so as to determine their rights upon the *then* condition of things; but the issuance of the patent gave new rights; the patentee and his grantees then had a right superior to any theretofore owned or held by them, viz., the ownership of the land. They then had something which the State had not theretofore parted with. In a suit for the recovery of the land, commenced after the issuance of the patent, the Statute of Limitations cannot be held to have commenced running prior to the date of the patent. (47 Cal. 570; Hagar v. Spect, 48 id. 406; 49 id. 12; Henshaw v. Bissell, 18 Wall. 255, 21 L. Ed. 835.)" (Emphasis in original)

Although this case was concerned with state rather than federal lands, we believe that the distinction there pointed out applies equally well to federal lands. This belief is supported by Hayes v. Martin, 1873, 45 Cal. 559, 563–64, where the court stated that the statute of limitations could run to establish adverse possession in favor of one person against another's title, even though paramount title was in the United States.

■ Finally, the United States Supreme Court has indicated that state

11. Belk v. Meagher, 1881, 104 U.S. 279, 283–84, 26 L.Ed. 735; Benson Mining & Smelting Co. v. Alta Mining & Smelting Co., 1892, 145 U.S. 428, 430, 12 S.Ct. 877, 36 L.Ed. 762; La Laguna Ranch Co. v. Dodge, 1941, 18 Cal.2d 132, 114 P.2d 351, 135 A.L.R. 546; Fulkerson v. Chisna Min. & Imp. Co., 9 Cir., 1903, 122 F. 782; Wetsel v. Superior Court, 1953, 119 Cal.App.2d 703, 708, 260 P.2d 242; South End Min. Co. v. Tinney, 1894, 22 Nev. 221, 38 P. 401, 402. Compare, Dougherty v. California Kettleman Oil Royalties, Inc., 1937, 9 Cal.2d 58, 76–77, 69 P.2d 155.

12. Redfield v. Parks, 1889, 132 U.S. 239, 10 S.Ct. 83, 33 L.Ed. 327; Henshaw v. Bissell, 1873, 85 U.S. (18 Wall.) 255, 270, 21 L.Ed. 835; Gibson v. Chouteau, 1871, 80 U.S. (13 Wall.) 92, 20 L.Ed. 534; Tyee Consol. Min. Co. v. Langstedt, 9 Cir., 1905, 136 F. 124, and cases cited at p. 128; Anzar v. Miller, 1891, 90 Cal. 342, 27 P. 299; Gardiner v. Miller, 1874, 47 Cal. 570. Cf. also, Kentfield v. Hayes, 57 Cal. 409; 7 P.C.L.J. 549.

statutes of limitation can be applied to unpatented mining interests. In Farrell v. Lockhart, 1908, 210 U.S. 142 at 146, 28 S.Ct. 681 at 683, 52 L.Ed. 994, the Court stated:

> "Not doubting at all the correctness of the decision in the Lavagnino Case (198 U.S. 443, 25 S.Ct. 716, 49 L.Ed. 1119), especially in view of the issue as to long possession and the operation of the bar of the statute [of limitations] of the state of Utah, which was applied by the court below in that case, and whose judgment was affirmed, we do not pause to particularly reëxamine the reasoning expressed in the opinion in Lavagnino v. Uhlig as an original proposition."

We hold that state statutes of limitation can be applied to claims of private parties to unpatented mining interests even though paramount title remains in the United States, at least where, as here, a patent has not issued during the running of the statutory period.

### III. Can Appellee Challenge Appellants' Title?

Appellants point out that appellee as grantee is in possession of the properties but is contesting appellants' right to recover the properties. Appellants argue that a vendee in possession cannot challenge his vendor's title without surrendering possession, citing Butler v. Woodburn, 1942, 19 Cal.2d 420, 122 P.2d 17; Coates v. Cleaves, 1891, 92 Cal. 427, 28 P. 580; Belcher Consol. Gold Mining Co. v. Deferrari, 1892, 62 Cal. 160. The appellants fail to point out, however, that the relevancy of this rule to the case at bar was completely dispelled by the District Court of Appeal in Molybdenum Corp., of America v. Kasey, 1959, 176 Cal.App.2d 357, 365–66, 1 Cal.Rptr. 400, 405–06, which is controlling upon us here. We obviously cannot hold that that case is not California law, and not here controlling.

### IV. Seisin

The language of § 318, California Code of Civil Procedure, requires that the plaintiff be seised or possessed of the property within five years of the commencement of the action. Appellants admittedly do not satisfy the possession requirement. Were they seised of the property within five years of the commencement of the action?

Appellants urge a construction of the statute whereby if appellants could establish in court that they have a right to recover possession and title, they have seisin. If a right established on the merits to recover title and/or possession were sufficient to establish seisin, the statute of limitations of § 318 would never be a bar. Each case would be decided on the merits of whether the plaintiff was *entitled* to recover title and/or possession. We refuse to adopt a construction which would render the statute of limitations meaningless. We have not been cited to, nor have we found, any authority contrary to our conclusion.

At the same time, there is no question that if appellants still have legal title, they have seisin. Cf. McKelvey v. Rodriguez, 1943, 57 Cal.App.2d 214, 223, 134 P.2d 870. Appellants assert that they still have legal title. They assert that legal title never passed from them to appellee because (1) appellants never intended it to pass, and because (2) the deeds were void ab initio.

(1) Appellants first contend that legal title never passed from them to appellee, because appellants never intended to pass legal title until payment of the full $2,000,000; i. e., that there was no "delivery" in a legal sense. The appellants contend, and the district court agreed (R.T. 47), that whether the manual delivery of the signed deeds also constituted legal delivery of legal title depends upon the intent of the grantor. California Civil Code § 1054.

The circumstances surrounding the delivery, including acts and declarations of the grantor both before and after his transmission of the deed, are admissible to aid in this determination of fact. Osborn v. Osborn, 1954, 42 Cal.2d 358, 267 P.2d 333. But under California Civil

Code § 1056 and California Code of Civil Procedure § 1856, and cases thereunder, parol evidence as to the grantor's *subjective* intent is inadmissible to establish intent as to delivery. The district court was thus correct in not permitting Mrs. Kasey to testify as to whether she *intended* legal title to pass. (R.T. p. 46 line 22 to p. 48 line 25.)

California Civil Code § 1056 provides:

"DELIVERY TO GRANTEE IS NECESSARILY ABSOLUTE. A grant cannot be delivered to the grantee conditionally. Delivery to him, or to his agent as such, is necessarily absolute, and the instrument takes effect thereupon discharged of any condition on which the delivery was made. (Enacted 1872.)"

The district court found that there was delivery; that each deed was "duly executed and delivered" to appellee. (C.T. 392.) Such a finding is obviously not clearly erroneous because (1) the deeds were absolute on their faces, and (2) the option agreement, which appellants had both read (R.T. 57, 61, 71), included provisions that the $135,000 would be paid upon execution and delivery of "good and sufficient" deeds to the property and that the balance would "be payable, if at all, only as, when and to the extent that royalties shall become payable * * *." Appellants cannot rely on their alleged blind confidence in their attorney, and their own unwillingness to read the deeds, as grounds for questioning the transfer of legal title by their personal actual delivery of deeds absolute in form.

A not dissimilar problem is the argument by appellants that a deed absolute on its face can be shown by parol evidence to have been intended only as a mortgage, citing: Cal.Civil Code § 2924; Beeler v. American Trust Co., 1944, 24 Cal.2d 1, 147 P.2d 583; Gronenschild v. Ritzenthaler, 1947, 81 Cal.App.2d 138, 183 P.2d 720; Jensen v. Friedman, 1947, 79 Cal.App.2d 494, 179 P.2d 855; Chapman v. Hicks, 1919, 41 Cal.App. 158, 182 P. 336; DeLeonis v. Hammel, 1905, 1 Cal.App. 390, 82 P. 349.[13] However, all are situations where the *grantor* claims that all he *conveyed* was a mortgage. Here the grantors apparently are inferring that they *retained* a mortgage. No cases are cited for the situation here existing.

Nor did the appellants offer any proof that they intended to retain a mortgage. Although they offered proof of their intent not to convey the legal title, that, in itself, is insufficient proof to demonstrate that they intended to retain a mortgage.

Additionally, the trial court made findings which are inconsistent with appellant's mortgage argument.

"9. It is true that ever since June 11, 1951 defendant has been in actual, continuous, exclusive and uninterrupted possession of such of said Primary and Secondary claims, and appurtenant rights and property, as were valid mining claims on said date and of the areas of land included within the boundaries of such of said claims as were invalid mining claims on said date; that ever since September 21, 1951 defendant has had legal title to said Primary claims and appurtenant rights and property and has been the sole owner thereof to the extent that said claims were valid mining claims on said date, and that ever since September 21, 1951 defendant has had legal title to said Secondary claims and appurtenant rights and property and has been the sole owner thereof to the extent that plaintiffs and their said associate, or any one or more of them, on said date had or thereafter acquired any right, title or interest therein or thereto." (C.T. 393)

13. Appellants' only reference to this theory appears on page 12 of Appellants' Opening Brief, with a passing reference to pages 362 to 366 of the Clerk's Transcript (without quoting it), wherein such a theory is mentioned.

The cases cited by appellants to support their mortgage argument hold that a finding of the trial court based on conflicting evidence, on the issue of whether only a mortgage was conveyed, will not be disturbed on appeal. The above quoted finding of the trial court is not clearly erroneous, in light of the absolute deeds and the provision of the agreement that the $1,850,000 was to "be payable, if at all, only as, when and to the extent that royalties shall become payable."

Thus, appellants' lack of intent position fails for lack of proof, and because of adverse findings amply supported by substantial evidence.

(2) Appellants' second contention as to seisin is that legal title (and thus seisin) never passed, because the deeds were void ab initio. Within this contion we decipher three separate contentions:

(a) Appellants contend that their attorney's conduct constituted a breach of fiduciary duty rendering the deeds void ab initio. However, in the cases cited by appellants or found by us which hold deeds void ab initio on such grounds of breach, the person upon whom the plaintiff relied took advantage of the plaintiff *for the benefit of that person himself or of his principal.*[14] No proof of any benefit to the attorney was offered herein.

In the absence, as here, of proof that the appellee knew or participated in any breach of duty by appellants' attorney, appellants cannot question the conveyance to appellee on the ground of such alleged breach of duty.[15]

(b) Appellants' arguments might be interpreted as implying that if a deed is secured by fraud, it is void ab initio. However, the rare cases which appellants have cited or which we have found stating that a deed procured by fraud is void ab initio, rather than being in the usual "voidable" class, have so held, and state that they so hold, only where the deed was forged,[16] or where the misrepresentation was that the document was of an entirely different nature than the defrauded party understood it to be (such a misrepresentation as that a deed was actually a personal letter).[17] No proof of any facts remotely similar to these was offered by the appellants.

(c) Nor do we think that appellants can claim that they retained seisin on the ground that appellee's promise, made allegedly without any intent to perform, renders the contract induced by the promise "null and void" and not "legally binding."

California Civil Code § 1572(4) provides that a promise made without any intention of performing it constitutes fraud where made with the intent of inducing the other party to the contract to enter into the contract. Appellants rely on language in certain cases, the strongest of which is the following:

"[I]t has been held that where the execution of a contract has been in-

14. Meyer v. Haas, 1899, 126 Cal. 560, 58 P. 1042; Loftis v. Marshall, 1901, 134 Cal. 394, 66 P. 571. Cf.: Calmon v. Sarraille, 1904, 142 Cal. 638, 76 P. 486; Kane v. Mendenhall, 1936, 5 Cal.2d 749, 56 P.2d 498; Valdez v. Taylor Automobile Co., 1954, 129 Cal.App.2d 810, 278 P.2d 91.

15. Schultz v. McLean, 1892, 93 Cal. 329, 28 P. 1053; De Arnaz v. Escandon, 1881, 59 Cal. 486; Shammas v. Boyett, 1952, 114 Cal.App.2d 139, 249 P.2d 880. Cf.: Conklin v. Benson, 1911, 159 Cal. 785, 116 P. 34, 36 L.R.A.,N.S., 537; Miller v. Wood, 1963, 222 Adv.Cal.App. 240, 243, 35 Cal.Rptr. 49; Tampico v. Wood, 1963, 222 Adv.Cal.App. 246, 249, 34 Cal.Rptr. 885; United States v. Barber Lumber Co., C.C.Idaho, 1908, 169 F. 184; Leeper v. Beltrami, 1959, 53 Cal.2d 195 at 206, 1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803; Carroll v. Carroll, 1940, 16 Cal.2d 761, 770–71, 108 P.2d 420, cert. den. 314 U.S. 611, 62 S.Ct. 74, 86 L.Ed. 491.

16. Cutler v. Fitzgibbons, 1906, 148 Cal. 562, 83 P. 1075.

17. Erickson v. Bohne, 1955, 130 Cal.App.2d 553, 279 P.2d 619; Conklin v. Benson, 1911, 159 Cal. 785, 116 P. 34, 36 L.R.A., N.S., 537; Loftis v. Marshall, 1901, 134 Cal. 394, 396, 66 P. 571. Cf.: Meyer v. Haas, 1899, 126 Cal. 560, 58 P. 1042; Garcia v. California Truck Co., 1920, 183 Cal. 767, 192 P. 708; Bonacci v.

duced by a promise made without any intention of performing it, this constitutes such fraud in obtaining the contract that it may be declared null and void in an equitable action brought for that purpose. Parol evidence to show fraud is permitted in such cases on the theory that it does not, in fact, change or contradict the terms of the contract but rather shows that no binding contract has been legally made. Appellant cites in this connection Williams v. Hasshagen, 166 Cal. 386, 137 P. 9; Martin v. Lawrence, 156 Cal. 191, 103 P. 913; Millar v. Millar, 175 Cal. 797, 167 P. 394, L.R.A.1918B, 415, * * *; Graham v. Los Angeles First National Trust & Sav. Bank, 3 Cal.2d 37, 43 P.2d 543; Boulevard Land Co. v. King, 125 Cal. App. 224, 13 P.2d 864, and a number of cases."

Cobbs v. Cobbs, 1942, 53 Cal.App.2d 780, 783–784, 128 P.2d 373; see also, Simmons v. California Institute of Technology, 1949, 34 Cal.2d 264, 274, 209 P.2d 581; Matteson v. Wagoner, 1905, 147 Cal. 739, 82 P. 436; Lawrence v. Gayetty, 1889, 78 Cal. 126, 20 P. 382.

■■■■ We hold that the statute of limitations cannot be avoided merely because the suit is based on a lack of intent to perform the written obligation clearly stated. This, if established, would not make the transaction void ab initio, but only voidable.[18]

### V. Fiduciary Relationship

Appellants contend that the statute of limitations is irrelevant because, by reason of the royalty agreement, the parties are in a fiduciary relationship. They cite and rely on Kennedy v. Seaboard Oil Co., N.D.Cal., 1951, 99 F.Supp. 730. In that action under California law for an accounting for unpaid royalty payments, Judge Harris stated that where the parties are in a fiduciary relationship such as a joint adventure or cotenancy, the

statute of limitations is no bar. The court cited no authority for this proposition. The court also stated that in such a royalty situation, the court would be willing to impress a constructive trust on the grantee in order to prevent an unjust enrichment which would otherwise result.

In reply appellee relies on Honolulu Oil Corp. v. Kennedy, 9 Cir. 1957, 251 F.2d 424. There, however, the court concluded, in applying California law: "We hold that there was no trust [no coadventure] and no fiduciary or confidential relationship here created by this agreement." (Id. at 431.) And the court in Honolulu presumed without citation of authority (as did the court in Seaboard) that if such a fiduciary relationship existed, the statute of limitations would not be a bar.

■■■■ Apparently both courts had in mind the California rule that a statute of limitations does not begin to run where there is a fiduciary relationship between the parties until the relationship is repudiated. See 31 Cal.Jur.2d Limitation of Actions §§ 22, 23, 138–41.

Here the parties are clearly not coadventurers. Honolulu Oil Corp v. Kennedy, 9 Cir. 1957, 251 F.2d 424, 429–31 and nn. 9 and 10; see also: Callahan v. Martin, 1935, 3 Cal.2d 110, 43 P.2d 788, 101 A.L.R. 871, and La Laguna Ranch Co. v. Dodge, 1941, 18 Cal.2d 132, 114 P.2d 351, 135 A.L.R. 546.

The fact that the agreement reserves to the Kaseys the right to remove mica and tungsten from some of the properties transferred to appellee indicates that they are, at best to a very limited extent, cotenants. However, the appellants never offered any proof at the hearing that the appellee was breaching in any way its obligation to appellants to allow them to remove such mica and tungsten from the specified properties. The only mention in the hearing of the mica and tungsten was the fact that the parties had been in dispute as to whether the

Massachusetts Bonding & Ins. Co., 1943, 5S Cal.App.2d 657, 137 P.2d 487.

18. See cases cited in footnotes 16 and 17, supra.

Kaseys' right was assigned and inheritable. There was no mention of cotenancy or of a fiduciary relationship in this regard, nor was there any dispute alleged as to whether the Kaseys had such a right. Such passing reference is not enough proof to preserve a possible argument that there was a cotenancy relationship (because of the right to remove mica and tungsten) such as to suspend the running of the statute of limitations in this action to recover *all* the properties transferred.

If appellants mean by their fiduciary relationship argument that the royalty agreement creates an express trust, we think appellants in their 1953 complaint alleged so many repudiatory statements and acts of misconduct on the part of appellee that appellants cannot now claim that the express trust, if there was one,[19] was not repudiated by appellee more than five years before the commencement of this suit in 1959. In the 1953 complaint appellants alleged, inter alia:

(1) appellee falsely represented to appellants that appellee had a profitable process for working the properties, which representations induced appellants to enter the agreement;

(2) appellee had since the agreement continued such assertions, knowing them to be false;

(3) appellee assured appellants they would receive $100,000.00 or more per year in royalties;

(4) appellee was failing to account for ore removed from the properties, and appellee had due, unpaid, and owing to appellants $7,277,350.00 for ores so removed;

(5) appellee had committed waste;

(6) appellee had made many promises without any intention of performing them, and

(7) most importantly, appellants alleged in 1953:

"II. Pursuant to Paragraphs 4 and 5 of said agreement, defendants agree to mine from the Wash Queen claim and a good, valid, subsisting primary claim of plaintiffs.

"III. Defendants now claim not to have commenced or to be mining ore from within said Wash Queen claim and a good, valid, and subsisting primary claim." (Civil No. 16147–T, Southern District of California, Central Division, Complaint.)

The appellee, in its original answer, in said 1953 suit, filed more than five years before the commencement of this suit, denied that it had "agreed to mine from the Wash Queen claim and a good, valid, and subsisting primary claim" of appellants.

We can understand the legal requirement that a repudiation be so clear that the plaintiff can easily understand it to be such. See 31 Cal.Jur.2d Limitation of Actions § 138. A court is reluctant to throw out a claim against a trustee on the ground that the claimant *might* have understood from the trustee's conduct that the trustee had repudiated the trust. But here appellants were so sure of the repudiation that they brought a suit for rescission, based on these alleged circumstances.

In the light of the original 1953 complaint and answer, we cannot see how appellants could now inferentially claim (which they do not directly claim) that the express trust, if any, was not repudiated by appellee until within five years of the commencement of the suit. If there is any justification for finding a fiduciary relationship in the royalty agreement here, it must be in (a) a duty, while in possession during the option period, not to overlocate any of the Kaseys' claims invalid only because of a technical defect, (b) a duty to pay royalties, and (c) a duty, if there is one, to work the properties so that the royalties may become payable. Mr. Kasey testified in the hearing that he discovered the claims overlocated by appellee's agent on the Kaseys' claims on August 25, 1951, even before the deeds were conveyed. (R.T. 67.) Appellee's lack of payment of royal-

19. Which is in itself very questionable.

ties was one of the grounds stated by appellants for their 1953 rescission action. If there was a duty to work the properties, which we do not decide, it would undoubtedly [20] begin with the duty to work the Wash Queen property where overlapped by a valid Kasey claim. Such a duty appellee expressly denied in its original answer in the 1953 suit filed more than five years before the commencement of this action. Thus, if there was any fiduciary relationship created by this agreement, we hold that appellants cannot now claim that it was not repudiated by appellee more than five years before the commencement of this suit.[21]

## VI. Covenant Running With the Land

Appellants contend that the statute of limitations is irrelevant because the royalty agreement here is a covenant running with the land. They rely principally on Kennedy v. Seaboard Oil Co., supra. However, the fact that the royalty agreement is binding on the assignees of the parties to the agreement and is expressed to be a covenant running with the land would neither add nor detract from the rights appellants have against this appellee with whom they directly contracted, even though such a covenant can be described as an interest in property. And see the holding in Honolulu Oil Corp. v. Kennedy, supra, at 430–32.

## VII. The Running of the Statute of Limitations

In their original and amended complaints filed in this action, appellants' allegation was that appellee, at sometime following the execution of the agreement,[22] devised a scheme to do certain acts, which acts allegedly constituted "a material and total breach and repudiation of said agreement." (C.T. 12, 50.) Since the filing of these complaints, appellants have contended, in the hearing in the district court and/or in the voluminous papers filed in this action in both the district court and in this court, that appellants are entitled to at least the following causes of action: (1) anticipatory repudiation, (2) abandonment, (3) breach of duty to work the mining properties, (4) fraud, (5) lack of intent to perform the contract, (6) impression or breach of a constructive trust, (7) material and total breach of contract, and (8) coercion (duress?).

However, even assuming arguendo that these causes of action have all been preserved, appellants have failed to demonstrate how these alleged causes of action avoid the fatal running of the statutory bar of California Code of Civil Procedure § 318. Appellants have argued that § 318 is no bar at all, and they have argued that even if it is a possible bar, it has not begun to run be-

---

20. Section FOURTH of the agreement reads:
"When and as MOLYBDENUM shall commence commercial operations for the mining and production of rare earth minerals from any of the other Sulphide Queen claims, it is understood that MOLYBDENUM shall commence or shall have commenced the mining and production of rare earth minerals from any deposit or vein within the Wash Queen claim with respect to which OWNERS may be entitled to the payment of a royalty under the provisions of Section FIFTH hereof and shall continue such mining and production so long as the same shall in MOLYBDENUM'S judgment be economically feasible, provided that this Section shall not become effective unless and until MOLYBDENUM shall have exercised the option granted in Section FIRST hereof."

21. For the purposes of this argument we have assumed but not decided that the statutory bar of § 318 does not begin to run until the cause of action accrues. See discussion, infra, Pryor v. Winter, 1905, 147 Cal. 554, 82 P. 202.

22. The original complaint alleged (C.T. 11):
"At sometime prior to April 29, 1953, the exact time being unknown to plaintiffs, but which they are informed and believe and on that ground allege was December 1, 1952 and April 15, 1953, defendant conceived a plan and scheme to unjustly enrich itself and deprive plaintiffs of their property as follows: * * *"
The amended complaint changed the dates to "between January 1, 1953 and April 15, 1953 * * *." (C.T. 47)

cause title never passed. We have discussed and dismissed those arguments, supra.

And appellants have not shown that the statute of limitations would have begun to run only at a time *within* the five year period preceding the commencement of this suit. The district court justifiably assumed that § 318 means just what it says; that a suit cannot be maintained for the recovery of real property if the plaintiff has not had seisin or possession of the property within the five years preceding the commencement of the action. However, we have discovered rationalia in Pryor v. Winter, 1905, 147 Cal. 554, 557–58, 82 P. 202, indicating that the statutory period of § 318 might not begin to run until the cause of action accrues. Yet, even were we to assume, without deciding,[23] that this rationalia is still good law, appellants cannot avail themselves of this possible argument because of their failing to offer adequate proof that the statute would have begun to run at a time within the five years preceding the commencement of this suit.

Appellants offered evidence of the alleged acts of appellee which acts, appellants contended, demonstrated appellee's repudiation and abandonment of the agreement. Some of this evidence was received; some was not. But appellants did not claim that any of this evidence was being offered to show that they did not know and could not know, until within five years of the commencement of this action, of the facts giving rise to any of the claimed causes of action. Except for their own testimony that they had received no royalty payments or quarterly statements from appellee from early 1953 to 1960, appellants offered no proof of any acts of discoveries occurring within five years of the commencement of this suit on April 8, 1959.[24]

Appellants did claim that appellee *concealed* until 1960 the alleged fact that appellee was mining only from those properties from which appellants were not entitled to royalties. Appellants thereby implied that appellee was abandoning and repudiating the agreement by breaching its alleged duty to work the properties from which appellants were entitled to royalties.

It is far from clear whether there is such a duty on appellee. Such a duty is often implied,[25] but ordinarily only where the royalty agreement is the sole consideration for the conveyance or lease. Here there was additional and immediate compensation of $150,000, which might,[26] or might not,[27] be controlling. Here, also, although the agreement can be read as requiring appellee to commence working those parts of the Wash Queen properties from which appellants may be entitled to royalties, the agreement spe-

23. To see the confusion in this area, see, *e. g.*: Leeper v. Beltrami, 1959, 53 Cal. 2d 195, 347 P.2d 12, 1 Cal.Rptr. 12, 77 A.L.R.2d 803; Lavely v. Nonemaker, 1921, 212 Cal. 380, 298 P. 976; Sorensen v. Costa, 1948, 32 Cal.2d 453, 460–61, 196 P.2d 900; Cella v. Cosgro, 1953, 115 Cal.App.2d 816, 821, 253 P.2d 57; Apablasa v. Sepulveda, 1928, 91 Cal. App. 232, 242, 267 P. 105; Curtner v. United States, 1893, 149 U.S. 662, 676, 13 S.Ct. 985, 37 L.Ed. 890; and Goodnow v. Parker, 1896, 112 Cal. 437, 44 P. 738, and cases there cited.

24. Thus we have no need to determine whether, if the statute might begin to run at a time later than the date of the conveyance, it begins to run from the time (1) the facts giving rise to the cause of action occur, (2) when plaintiff learns they have occurred, or (3) when plaintiff should have learned they had occurred.

25. See, *e. g.*: Downing v. Rademacher, 1901, 133 Cal. 220, 65 P. 385; Sledge v. Stolz, 1919, 41 Cal.App. 209, 182 P. 340; Payne v. Neuval, 1908, 155 Cal. 46; 99 P. 476; Acme Oil & Mining Co. v. Williams, 1903, 140 Cal. 681, 74 P. 296; Annotation, 76 A.L.R.2d 721 (1959); Annotation, 60 A.L.R. 901 (1928).

26. See Shaw v. Caldwell, 1911, 16 Cal.App. 1, 9, 115 P. 941, and the cases cited in note 25, supra.

27. See Freeport Sulphur Co. v. American Sulphur Royalty Co., 1928, 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890, 896–97; Annotation, 76 A.L.R.2d at 725, n. 18.

cifically provides that appellee "shall continue such mining and production so long as the same shall in MOLYBDENUM'S judgment be economically feasible * * *." We have assumed, for the purposes of this opinion only and without deciding the issue, that there is a duty on appellee to work the properties so that appellants may be paid the royalties.

Appellants contend that appellee concealed until 1960 the alleged fact that it had not and intended not to work the properties from which appellants are entitled to royalties. Soon after the California District Court of Appeal's opinions were filed in December 1959, appellee sent royalty reports to appellants, which, appellants testified, they did not accept. (R.T. 56, 76.) But appellants claim it was only in 1960 that they learned of appellee's breach of duty.

We shall again assume, for purposes of argument, that the appellants' use of the word "concealed" is synonymous with the words "fraudulently concealed." We shall also assume that the doctrine of fraudulent concealment is read into every statute of limitations.[28]

We assume, rather than decide, these issues because they as well as several others have not been adequately briefed, and because decisions on these issues are not necessary to the disposition of this appeal.

The California District Court of Appeal has already held that appellants are entitled to royalties from only some of the conveyed properties. Kasey v. Molybdenum Corp. of America, 1959, 176 Cal. App.2d 346, 1 Cal.Rptr. 393; Molybdenum Corp. of America v. Kasey, 1959, 176 Cal.App.2d 357, 1 Cal.Rptr. 400. Included within this "royalty property" is most of the Wash Queen claim, except insofar as it is overlapped by the Onessa

#4 claim. There are other royalty properties,[29] but to accurately explain them would confuse the reader and add nothing to this opinion.

The appellants presented their concealment argument to the district court in the hearing in the following manner. At one point, Mr. Kasey was questioning Mrs. Kasey on direct examination as to certain acts of appellee concerning the location and purchase in 1951 by appellee of certain claims, including the Onessa #4 claim. Counsel for appellee objected "on the ground that it has no relevance whatever to the issues before the court on this date." (R.T. 37.) A discussion then ensued as to the relevancy of this evidence, especially as to the Wash Queen and Onessa #4 claims. One of Mr. Kasey's statements during the course of this discussion was the following:

> "Well, anticipated repudiation has not been alleged in any previous complaint or amended complaint or second amended complaint because, first of all, your Honor, in the case of Onessa #4, for instance, mining— this is a royalty contract. We had no idea and couldn't have any idea as to what defendant's intention was until it submitted in 1960 with an exhibit of schedules; that is quarterly accountings, wherein it showed where it was mining, royalty and non-royalty—now, this is a royalty contract. If you have a royalty contract it is essential—the law implies that you shall work that property in the interest of both parties." (R.T. 42–43.)

After some testimony from Mrs. Kasey concerning her intent as to the passing of title, Mr. Kasey again began asking Mrs. Kasey questions concerning the

---

28. Cf.: Duff v. Duff, 1886, 71 Cal. 513, 529–32, 12 P. 570; Pashley v. Pacific Elec. Ry., 1944, 25 Cal.2d 226, 153 P.2d 325; 31 Cal.Jur.2d Limitation of Actions § 202.

29. Probably insignificant to appellants in light of the fact the agreement (quoted

at note 20, supra) puts prime emphasis on the working of and royalties from the Wash Queen claim. Appellants state in their opening brief at page 9 that the "contract * * * [is] entirely dependent on the ore within the Wash Queen, its mandatory mining, and payment of royalties therefrom."

Onessa #4 claim. One of these questions was whether appellee, in notifying appellants in December 1951 that appellee had begun mining operations on the Wash Queen claim, had stated that the area was within the part of Wash Queen overlapped by Onessa #4. Counsel for appellee objected that "this has no bearing whatever" on the statute of limitations issue. A discussion again ensued during which Mr. Kasey made the following statement:

"But all I am bringing out the Onessa 4 for is that defendant when it filed its action 75700 in the Complaint—in the First Amended Complaint—left out every reference to Wash Queen Claim; that it owned Onessa #4 and that it was mining on the Onessa #4. But in the Second Amended Complaint about three months prior to the commencement of that trial it reversed its position, deleted all reference to the Onessa #4. Why?

"For this reason, your Honor: Somebody pulled a boner. Excuse the language. Somebody pulled a boner. But it is an admission. It is an admission that defendant at no time contemplated to perform this contract.

"This is essential to show that defendant concealed from 1952 until 1960 when it submitted these exhibits that it was mining on the Onessa #4 and completely abandoned the contract." (R.T. 54–55.)

These are the only statements appellants made to the district court in the hearing which possibly bear on the concealment argument. These statements can be read as contending that appellee concealed from appellants until 1960 the alleged fact that appellee was only working Onessa #4, from which, according to the 1959 DCA opinions, appellants were not entitled to royalties, but was not working properties from which ap-

pellants were entitled to royalties. But the only *proof* appellee offered of this concealment was (1) that appellee did not notify appellants in its December 1951 notice that it was mining in the Onessa #4 area of Wash Queen, and (2) that appellee did not tell appellants until 1960 that it had been mining Onessa #4 from the beginning of operations.

That "proof" is incredible. In their original complaint filed in the previous district court action, appellants alleged, inter alia:

"III. Defendants now claim not to have commenced or to be mining ore from within said Wash Queen claim and a good, valid, and subsisting primary claim." [30]

In answer to that particular allegation, Molybdenum replied in its Amended Answer, filed April 12, 1954:

"With respect to the allegations of paragraph III of the seventh cause of action, defendant alleges that it has undertaken and is now conducting mining operations upon a lode mining claim known as Onessa #4, which this defendant acquired from persons other than the plaintiffs herein, which was not located by said plaintiffs or any of them, which has never been owned by any of said plaintiffs, and which this defendant contends is and at all times has been senior and prior to and valid as against certain purported mining claims which this defendant acquired from plaintiffs; defendant further alleges that such contention is denied by plaintiffs and that said controversy, among others, is at issue and will be determined in the declaratory relief action mentioned in paragraph III of defendant's first defense to the sixth cause of action; defendant denies each and every other allegation of said paragraph III." [31]

30. Civil No. 16147-T, Southern District of California, Central Division, Complaint, pp. 7–8.

31. Id., Amended Answer, pp. 13 to 14.

Appellants offered no other proof that evidence of a breach of duty to work the property was concealed until 1960. It was not enough to offer proof that there were no quarterly statements or royalties from appellee between 1953 and 1960. It was at least necessary to show what those facts were which appellants first learned of in 1960. Appellants made no such showing. The only proof they offered of a concealed fact was incredible, in view of previous pleadings.

 There is no doubt that the burden is on appellants to prove facts demonstrating that the statutory period, if it might begin to run later than the date of the conveyance, did begin to run at a time within five years preceding the commencement of this suit. A plaintiff in an action based on fraud or mistake, brought after the expiration of three years after the fraud or mistake, must prove that he did not discover the facts until within three years prior to the commencement of the action, and show the time and circumstances under which the facts were brought to his knowledge.[32] A plaintiff must show that he was not negligent in learning the facts at such a late date.[33] The burden is on the plaintiff to show that he had seisin or possession within five years of the commencement of the action.[34] One who seeks to rely upon concealment of facts to overcome the statute of limitations must allege when the fraud was discovered, the circumstances of discovery, and show that he is not blamable for failure to discover.[35] And those parties claiming that the statute of limitations against their cause of action for breach of fiduciary duty was tolled until their discovery of pertinent facts "must allege and prove facts showing the time and surrounding circumstances of the discovery of the cause of action upon which they rely."[36]

Appellants were in *pro per* during the hearing in the district court, although they had been represented by counsel almost continually before that time. We recognize that at times, this is a handicap, although there is little evidence of any such handicap here. We must, however, still hold all litigants to basic rules respecting burden of proof. Otherwise, all issues could be tried over and over again.

 We hold that appellants failed to carry their required burden of proving that the statute of limitations began to run at a time within five years preceding the commencement of the suit.

The judgment of the district court is affirmed.

32. Stevens v. Marco, 1956, 147 Cal.App. 2d 357, 381, 305 P.2d 669; Shapiro v. Equitable Life Assur. Soc., 1946, 76 Cal. App.2d 75, 88, 172 P.2d 725.

33. Hobart v. Hobart Estate Co., 1945, 26 Cal.2d 412, 437–39, 159 P.2d 958; Scafidi v. Western Loan & Bldg. Co., 1946, 72 Cal.App.2d 550, 566–68, 165 P.2d 260.

34. Stafford v. Ballinger, 1962, 199 Cal. App.2d 289, 295, 18 Cal.Rptr. 568;

Haney v. Kinevan, 1946, 73 Cal.App.2d 343, 344, 166 P.2d 361.

35. Sidebotham v. Robison, 9 Cir. 1954, 216 F.2d 816, 824 (applying California law).

36. Bennett v. Hibernia Bank, 1956, 47 Cal. 2d 540, 563, 305 P.2d 20.